ATLANTIC & P. TEL. CO., (WESTERN UNION TEL. CO. v.) See Case No. 17,-445.

ATLANTIC ROYAL MAIL STEAM NAV. CO., (REMINGTON v.) See Case No. 11,-695.

ATLANTIC WORKS, (BRADY v.) See Case No. 1,795.

———

## Case No. 633.

### The ATLAS.

[4 Ben. 27;[1] 3 Amer. Law T. Rep. U. S. Cts. 89.]

District Court,[2] E. D. New York. Feb., 1870.

COLLISION IN THE KILLS — LOOKOUT — RULES OF SUPERVISING INSPECTORS —TOW BOAT AND TOW —APPORTIONMENT OF DAMAGES—LOSS OF CARGO.

1. A collision occurred in the Kills on the night of March 18th, 1868, between two steam-tugs, the Kate and the Atlas, each having canal boats in tow. A canal boat in tow of the Kate,

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

[2] [Affirmed by circuit court in The Atlas, Case No. 634, but afterwards reversed by supreme court in Phoenix Ins. Co. v. The Atlas, 93 U. S. 302.]

was struck by a boat in tow of the Atlas, and sunk. Insurers of the cargo on the sunken boat filed a libel against the Atlas alone, to recover for the loss of the cargo. On the hearing, the court stayed the proceedings to enable either party to apply to have the Kate also brought in, but neither party made such application. The collision resulted from a faulty lookout on both of the steam-tugs: *Held*, That the libellants were entitled to a decree against the Kate for one half the damage to the cargo.

[Cited in De Las Casas v. The Alabama, 92 U. S. 696; The J. L. Hasbrouck, Case No. 7,324; The City of Hartford & The Unit, Id. 2,753; The Alabama & The Gamecock, Id. 123; The Hudson, 15 Fed. 164.]

[See note at end of case.]

2. A negligent lookout is no lookout.

3. The pilot rules of the supervising inspectors in force at the time of the collision were controlled by the act of congress of 1864, (13 Stat. 60,) and none of those rules inconsistent with that statute are effective.

[Cited in The B. B. Saunders, 19 Fed. 121.]

4. Courts of admiralty may with propriety, consider the fact of a vessel's deserting, without cause, another vessel which has been injured in a collision with her, as a circumstance tending to show consciousness of fault.

5. Cases of the D. S. Gregory, [Case No. 4,-100;] The Bay State, [Id. 1,148;] and The Hanover, [Id. 6,034,] commented on.

[6. Cited in The Milwaukee, Case No. 9,626, to the point that, where a steamer departs from the statutory regulations, she assumes the entire risk of her signal being heard and understood by an approaching vessel, and of herself hearing and understanding the reply.]

[7. Cited in The Hudson, 15 Fed. 172, as a case in which a decree for half the damages was given, only after the libellant had declined to bring in the other vessel.]

[8. Cited in U. S. v. Miller, 26 Fed. 97, to the point that part regulations for the management of vessels, so far as they are in conflict with the statutory provisions, are null and void.]

This was an action brought by the insurers of the cargo of the canal boat A. E. Hurd, to recover of the steamboat "Atlas,"

[In admiralty. Libel in rem by the Phoenix Insurance Company, insurers of the cargo of the canal boat A. E. Hurd, against the steamboat Atlas, her engineer, etc., (the Camden & Amboy Railroad & Transportation Company, claimants,) to recover] the amount of the damage caused to such cargo by the sinking of the canal boat, in a collision which took place in the Kills on the morning of March 18, 1868, between the steamboat Atlas and the steam-tug Kate which was then towing the Hurd. The action which was instituted against the Atlas alone, proceeded to hearing upon the pleadings and proofs, and thereupon the court directed that the proceedings be stayed to enable either party to apply to have the tug Kate also brought into the action. Neither party availed themselves of the permission given and the court accordingly proceeded to determine the questions raised upon the pleadings and proofs as they stood. [Decree for libellants for one-half of the damage. This decree was affirmed by the circuit court in The Atlas, Case No. 634, but was afterwards reversed by the supreme court in Phoenix Ins. Co. v. The Atlas, 93 U. S. 302.]

T. E. Stillman, for libellants.
Sanford & Woodruff, for claimants.

BENEDICT, District Judge. As to some of the facts attending this collision there is no dispute. Others are in doubt and are to be gathered from a mass of contradictory and unsatisfactory testimony. It appears that the Kate, a small tug 52 feet long, left the dock at New Brighton on the day in question at about 3 a. m., having three vessels in tow upon a hawser, of which the canal boat, A. E. Hurd, was the starboard vessel. The wind was light and the night somewhat dark, but without fog. After getting clear of the dock, at New Brighton, the Kate according to the statement of the libel took a course about for Port Johnson on the Jersey shore. She had not proceeded far before her pilot heard a single blast of a whistle which at once fastened his attention upon a bright light approaching, which proved to be the steamer Atlas, bound down the Kills with the barge Julia in tow, upon her larboard side. Immediately upon hearing the single whistle the pilot of the Kate gave two blasts of his own whistle, at once stopped and reversed his engine, and starboarded his helm. Under the starboard helm the Kate swung to port, but had not time to change the direction of her tow, before she was struck upon her starboard side by the stem of the Atlas, while the barge Julia in tow of the Atlas struck the Hurd and sank her. The Atlas, as it appears, was running at the rate of some ten miles an hour, on a course down the Kills and her first knowledge of the proximity of the Kate, was noticing a light ahead which was supposed to be on a tow, also bound down the Kills. The pilot at once ported his wheel to pass to the right, and blew a single blast of his whistle, but, receiving the two blasts of the Kate in reply before he had materially changed the course of his steamer, at once hove his wheel hard a starboard and also stopped and reversed his engine. Before he could stop his headway however he was in contact with the Kate. As to these facts there can be no dispute, unless it be as to the course of the Kate, but her course, if not as broadly across the river as stated, was certainly crossing that of the Atlas.

Upon these facts it has been strenuously argued, on behalf of the Atlas, that the libel must fail, because the Atlas in porting her helm complied with the pilot rules of the supervising inspectors, while the Kate violated those rules by omitting to port, and so caused the collision. This argument is founded upon a misapprehension of the true rule of navigation applicable to such a state of facts.

The pilot rule of the supervising inspectors, with the accompanying illustration, of

what is called the fifth situation, is a rule which if held applicable in all cases of vessels "approaching each other in an oblique direction," is pregnant with danger. It embodies a manifest error which existed before the enactment of the international navigation regulations, and has even at times crept into interpretations of those regulations. This error has been the subject of much interesting discussion, and its dangerous consequences need not be explained here. They will be found clearly shown in Mr. Gray's "Remarks Respecting the Rule of the Road for Steamships," a pamphlet which has received the approval of the British admiralty, board of trade, and trinity house, as well as of the French government. See sections 39, 40, p. 9. But the pilot rules of the supervising inspectors are controlled by the subsequent legislation of congress in the enactment of the international navigation regulations of 1864. 13 Stat. 60. Since the passage of those navigation laws, no rule of the supervising inspectors inconsistent therewith can be effective. See Act July, 1866, § 9, [14 Stat. 228.] And accordingly, rule 2 of the pilot rules, which has been here relied on, in so far as it requires a port helm in all cases, manifestly inconsistent as it is with article 14 of the international navigation laws, is of no effect. Articles 14 and 18 of the navigation laws furnish the true rule of navigation, applicable when vessels are approaching each other obliquely, and give to the vessel having the other upon her starboard side an election as to porting or starboarding according to the direction of the respective courses. Under these two articles the responsibility of avoiding the Kate, in the present case, was cast upon the Atlas. She was at liberty to keep out of the way of the Kate by porting or by starboarding, as the case required, and it was a fault in her to port, if starboarding afforded the only opportunity of avoiding the disaster.

As I view the case, however, it cannot be made to turn upon the correctness of the manoeuvres of either vessel after they saw each other, for I consider it to be quite clear upon the evidence that there was then no time to make any material change in the courses. They could only stop and back, which they both did. That it was then too late to avoid the collision by changing the courses, is shown by the small effect which was produced by the action of the helms before the blow—by the fact that the Kate at once answered the whistle by two whistles—by the immediate stoppage of both engines—by the absence of all hails, by the contradictory statements as to the directions in which the two vessels were moving, and by other circumstances which appear in the testimony.

The question of the case then is, by whose fault was it that these two tows failed to discern each other until they were thus close together. That the Atlas is chargeable with fault in this respect is clear; for it is undisputed that she was running through a thoroughfare in the night without any lookout. The night was not so dark, but what, with due care, approaching vessels could have been seen in time to avoid them. Witnesses for the Atlas say, "it had been pretty dark, but had lit up then, so you could see quite a ways—could see lights plain enough." "A vessel without lights could be seen a quarter of a mile." I have no doubt, therefore, but that, with proper care, the Kate, a high pressure boat, could have been discerned in time to avoid her; for it is proved that she had a light at her flag staff, while the schooner in her tow had a light in her rigging; and I am satisfied that the failure to discover the Kate until the vessels were so near that, although both engines were promptly stopped and reversed, they came together, was owing to the absence of a proper lookout on the Atlas.

In addition to the fault of running without a lookout, another fault is charged upon the Atlas, namely: that she did not remain by the Kate to render assistance to the injured vessels, but at once departed on her way, leaving the sinking vessels to shift for themselves. Upon the evidence, putting the most favorable construction upon it, it is evident that the Atlas displayed no great solicitude in regard to the vessels, which she must have known to have been seriously injured, if she did not intentionally desert them.

But it is argued by the advocates for the Atlas that the subject of assistance is irrelevant to the question of damage. This is hardly so. The rules, which courts of admiralty lay down, often look beyond the mere question of remuneration for services rendered, or for loss sustained, and are intended not only to do justice between the parties litigant, but to prevent loss of life and preserve the ships, in the welfare of which as the instruments of commerce the whole community is interested. Therefore it is that the merchants' shipping act of England, (§ 33, Schedule Table C.), provides that in case of failure, on the part of a colliding vessel, to render assistance without reasonable excuse, the collision shall, in the absence of proof to the contrary, be deemed to have been caused by her wrongful act, neglect or default; by which act a proceeding to recover damages may almost be said to be in certain cases, changed into a penal proceeding to punish an offence. See note to amendment of merchants' shipping act. Macl. Shipp. Append. p. 22. No such statute exists in the United States, but courts of admiralty, may with propriety consider the fact of deserting without cause a vessel which has been injured in a collision as a circumstance tending to show consciousness of fault; and as, in the admiralty, public policy may be considered in disposing of costs, (1 Coote, p. 63), punishment for such an act may be inflicted by withholding or

imposing them as the case shall seem to require, (The Celt, 3 Hagg, Adm. 321; The Caledonia, 1 Spinks, [Catalina, 2 Spinks,] 23; The St. Lawrence, 7 Notes of Cas. 556.) In the present case, the Atlas being found in fault, the circumstances, attending her departure from the scene of the accident, need only be referred to here as confirmatory of the opinion that she was in fault.

It is equally clear to my mind, that the Kate was also *guilty of negligence which* conduced to the collision and in the same particular, namely, want of a proper lookout. As before stated, the night was not so dark, but that lights could with care have been seen in abundant time, and, upon the evidence, it is manifest that the Atlas displayed bright white lights. I say nothing in regard to the side lights either on the Atlas or the Kate, for the reason that I hold the collision not to have occurred by reason of any mistake of courses, but because the bright lights, which should be seen before the side lights, were not seen by either vessel until the vessels were upon each other. It is true the evidence shows that the Kate had a man on deck to look out, but it also shows that neither he nor the pilot saw the Atlas' lights till just before they struck. A negligent lookout is no lookout. For this reason therefore I hold the Kate as well as the Atlas to have been in fault.

This then is the case of a collision produced by the concurrent negligence of two vessels, and the question next arising is as to the extent of the liability of these vessels respectively for the loss sustained by the cargo which was being transported. If this were an action brought in behalf of the Kate against the Atlas, no doubt would arise upon the question; for the well known rule of the admiralty is to apportion the damages between the two vessels when both are in fault. But here the case is a different one from that presented where the action is instituted in behalf of one of the colliding vessels, and the damages are sought to be apportioned between the parties to the action, who are found to be each in fault. This action is in behalf of the owners of cargo laden on board the canal boat A. E. Hurd, which boat was at the time being towed by the Kate; and it is instituted not against the Hurd, which was the carrier, nor against the Kate, which had assumed the duty of towing the Hurd with proper care and skill, nor against the vessel which actually inflicted the blow, for that was the barge Julia, herself in tow of the Atlas; but it is against the Atlas as one of the two colliding vessels responsible by reason of the negligence of her master and crew for the injury caused thereby. It cannot then be pretended that any act or omission on the part of the owners of this cargo conduced to produce the collision. The shippers of the cargo made no contract with the Kate. Their contract was with the Hurd, and they could take no part in the employment or the management of the Kate. Neither did those in charge of the Hurd have any control over the navigation or management of the Kate. The tug was an independent principal, so far as this collision and this cargo was concerned, charged with the duty of avoiding the neglect which caused the accident and responsible for the results of that neglect. There is no room therefore for the application of the principles of the law of agency, and it cannot be held that the libellants are chargeable or identified with the neglect of the Kate, and for that reason subject to the same rule which would be applied to her in regard to the amount of damages. Nor is this a case of joint negligence on the part of the Atlas and the Kate, in which the acts of the Kate are, in law and by reason of a common design, the acts of the Atlas, so as to render her responsible for all that occurred. The fault of the Kate, as well as that of the Atlas, was one of omission, and there would be neither justice nor sense in saying that the omission of the Kate to have a lookout could be imputed to the Atlas, who knew nothing of the existence of such a vessel till she struck her.

In a court of common law, then, upon the facts of this case, an action against the owners of these two colliding vessels, founded upon an allegation of joint negligence, could not, as I understand the law, be properly maintained; and although in an action against either, in such a tribunal, the whole amount of the loss would be adjudged, the reason is because the courts of common law hold it to be impossible to determine in such a case the proportion of the loss imputable to each offender, and therefore, from necessity, being permitted to consider legal liabilities only, give judgment for the whole amount in the one case, and refuse to permit any recovery in an action by one of the parties in fault. But while such is the rule of courts of common law, courts of admiralty, "where a mixture of public law and of maritime law and of equity are often found in the same suit" (Parsons v. Bedford, 3 Pet. [28 U. S.] 447), when the proceeding is to recover damages arising from a collision of ships, for reasons peculiarly their own, feel compelled to divide the loss. In a court of admiralty, the action may be instituted against both the colliding vessels, and the decree be against either one of them for the whole, or, by reason of the "great advantage" which the admiralty has of being able to do so, (The Friends, 4 Moore, P. C. 322), one-half the damages may be decreed against each; and the action may also be against one of two colliding vessels found equally in fault, and one half the loss decreed as the proportion of loss properly chargeable to the vessel proceeded against. In this instance, for example, the present proceeding might have included the Kate with the Atlas, and

such is the more common form of the pro-, ceeding; or the libellants might have joined with the owners of the Kate in an action against the Atlas, Coote, p. 11. The Commander-in-Chief, 1 Wall. [68 U. S. 43;] William & B. Adm. p. 67; The Hanover, [Case No. 6,034.] Or, if there had been an action by the owners of the Kate alone against the Atlas, and also an action by the owners of the Atlas against the Kate, all would have been heard together, perhaps even consolidated (Coote, p. 27), and such decrees made as the rules of maritime law and the course of the admiralty require. Sturgis v. Boyer, (The Hector,) 24 How. [65 U. S.] 110; The Catharine, 17 How. [58 U. S.] 177; Hay v. Leneve, 2 Shaw App. 395; The Anna Kimball, [Case No. 404;] The Marion, [Case No. 9,087;] and cases cited by Dr. Lushington in deciding The Milan, 1 Lush. 388; The Aurora, 1 Lush. 328; The Hector, [Case No. 6,317.]

If, then, in an action against one of two colliding vessels, in behalf of another found equally negligent, a court of admiralty is competent to ascertain and adjudge the amount of damage chargeable to the neglect of the vessel proceeded against, I see no reason why it is not equally competent to do the same in an action like the present, nor why the same rule should not be here applied. It will more clearly appear that such should be the law, if we advert to the reasons which are supposed to call for the application of the rule of apportionment. This rule of the admiralty is too venerable, and has been too often approved by great authorities, coming down to the present day, to admit of question or require defence. Its wisdom, as applied to modern commerce, appears fully demonstrated by the circumstance that when disturbed by the merchants' shipping act of England, passed in 1854, the rule proved too strong for statutory innovation, and it was found necessary to reinstate it in the merchants' shipping amendment act. 25 & 26 Vict. 63, 29. It is a rule of equity, but not of equity alone. It has also a foundation in expediency. In furtherance of equity, it compels a party in fault to share in the loss arising therefrom; and it refuses to permit a party to be charged with the whole of a loss shown to have been caused by another party as well. In the interest of commerce and of the community at large, this rule—as also the rule of limited liability, (The Carl Julian, cited in The Dundee, 1 Hagg. Adm. 113,)—seeks to distribute somewhat those losses which so frequently attend the navigation of the ships, and which result from a negligence on the part of masters and seamen, against which the most prudent owners cannot entirely guard; and which, owning to the imperfection of human tribunals, and the nature of the facts in dispute, may well be supposed liable to be sometimes cast upon the innocent. And it also aims to increase care and skill on the part of navigators, in order to diminish as much as possible the risk of life and of property which always attends navigation upon the seas.

Thus Lord Denham speaks of the rule as "growing out of an arbitrary provision in the law of nations, from views of general expediency, not as dictated by natural justice, nor (possibly) quite consistent therewith. De Vaux v. Salvador, 4 Adol. & El. 420. So Judge Ware speaks of it as "in conformity with the spirit of the maritime law, which generally aims more at practical utility and the interest of navigation than at a logical and scientific deduction of general and abstract principle;" and in The Scioto, [Case No. 12,508,] he says: "The maritime law, from considerations of public policy, divides the loss." The rule is applied by Drummond, J., because under it "there would be greater caution and vigilance in navigation, and less effort and less temptation by corrupt and unfair means to misrepresent and distort facts." The Swan, [Id. 8,588.] And the supreme court of the United States, by Nelson, J., says: "We think the rule dividing the loss the most just and equitable, and as best tending to induce care and vigilance in navigation." The Catherine, 17 How. [58 U. S.] 178. These considerations have, from a very early period, and among many nations, been deemed to be controlling, and to require of admiralty courts the adoption of the rule in question, and they appear to be equally applicable to the vessels and cargoes composing a tow, whether considered to be in law one vessel, for the purposes of this rule, or whether considered to be separate independent interests. Applied to the vessels being towed, the rule tends to encourage the employment of competent tugs, navigated by competent men, and will cause the men on the tows to be more watchful to note and correct, as far as possible by their own vigilance, any neglect in the crew of the tug, as they may often do in the matter of lookout, hails, &c.

Applied in a case like this, it also works equity, for certainly there would be little justice in permitting these libellants to elect to charge the Atlas with the whole of this loss, which their own witnesses, called from the Kate, prove to have arisen from the fault of the Kate as much as from the fault of the Atlas. If the action had been instituted by the owners of the Kate to recover for the injury to this cargo, for which action the case of The Commander-in-Chief, 1 Wall. [68 U. S.] 50, would be an authority, the liability of the Atlas, upon this very claim would have been limited to one-half the amount of it. See cases cited by Dr. Lushington in The Milan. The Bay State, [Case No. 1,148.] It is not easy to see how in equity the liability of the Atlas can be permitted to be doubled by instituting the suit in the name of the present libellants, and calling upon the crew of the Kate to prove the case.

ATLAS (Case No. 633)

It was entirely competent for the libellants to have originally proceeded against the Kate, as well as the Atlas in this action, and so recovered their whole loss. Furthermore after the hearing had been had, opportunity was given to join the Kate, and it was declined without the suggestion of any facts existing to prevent that course. It certainly would not be just to permit the liability of the Atlas to be doubled by this mode of procedure, and for no other apparent reason than to save the Kate from her share of responsibility.

But it may be said the libellants are without fault, and should recover their whole loss, and the Kate may be sunk or beyond the reach of process, or of too insignificant a value to respond. No such facts appear, and not being suggested as a reason for declining the opportunity to join the Kate, they must be presumed not to exist. And whether the maritime law necessarily requires that the whole loss sustained by reason of collision should be recovered in an action against one of two offenders, is the question under discussion; and it might well be said here, if the case required it, as it does not, that the risk of an inability to recover of the Kate, recompense for loss arising from her negligence was a risk voluntarily assumed by the libellants and against which the Atlas could in no way provide, and that the maritime law looking to equity, and at the same time seeking to distribute losses of this character, when they occur, and to prevent their occurrence if possible, by creating a sense of responsibility in the minds of all persons engaged in commerce, will not permit those risks to be shifted to the shoulders of a single one of the parties in fault, but leaves them upon the party by whom they were in the first instance assumed. The rule of apportionment is a rule of limitation. It is adopted by maritime courts for the advantage of shipping among other reasons. Its object is to restrict the liability of each ship in cases of collision by mutual fault, to the injury arising from its own negligence. As to the ship herself, that proportion is always determined, and from necessity, by an arbitrary rule of equal division. The same division is possible in regard to the cargo. The same reasons there exist for the limitation, and the same rule should be applied,—certainly in a case like this, when no reason is shown for attempting to charge the whole loss upon one of the vessels. Furthermore the application of the rule of apportionment in actions brought by tows or their cargoes, will tend to compel the bringing before one and the same tribunal all the parties whose rights and liabilities are involved in the controversy and dependent upon the same facts, a result of no inconsiderable importance, when the nature of these controversies is considered. These considerations, it is believed, justify the conclusion to which I have arrived, that in an action like the present, the

rule of apportionment should be applied, and the recovery limited to one half the amount of the damage to the cargo in question. I have not thus far alluded to any adjudged cases, where the question, in the form here presented, has been decided. I am aware of no such case in the courts of this country, and no case has been here cited by either party. In the case of The Bay State, [supra,] one half the cargo was adjudged, but there the owners of the Bay State were the libellants. They could hardly however have been considered as owners of the cargo. In the later case of The D. S. Gregory, [Case No. 4,100,] which was an action for damages, for injury to a passenger in a collision arising from mutual fault, the liability of each vessel—both being then able to respond—was limited by the decree to one half the damages. I am not aware that the particular provision as to the execution inserted in the decree in that case, was a subject of discussion, and it could not have been deemed important, each vessel having given ample security for its portion of the loss.

The case of The Hanover, [Case No. 6,034,] decided by the learned Judge Betts, in 1851, is more nearly in point. There were cross actions, one in rem brought for vessel and cargo lost by collision, the other in personam; and both vessels being found equally in fault, the decree directed the damages of both parties to be ascertained and divided equally, but directed that "the value of the cargo is not to be included in the estimate, unless the owners thereof have made themselves parties to this action, so as to be concluded by its decree."

There is on the other hand a remark by Mr. Justice Wayne, in the case of The New Philadelphia, 1 Black, [66 U. S.] 76, which should not pass unnoticed, although the case has not been relied upon as an authority here. There the action was against a tug, between which and the libellant a contract had been made to tow a boat with care and skill, and it may be that, in such an action, considerations arising out of the contract would require a decree for the full damages, as to which no opinion from me is called for. But in that case the court finds as a fact that the tug was solely in fault. There was therefore no occasion to consider, and the court cannot be supposed to have intended to adjudicate upon the question here involved.

In the English admiralty this question, in substantially the same form here presented, has been adjudicated and after full argument and consideration it was held in the case of The Milan, 1 Lush. 404, that in an action brought by the owners of cargo laden on board of one of two vessels, found to be equally in fault for a collision, against the other colliding vessel, the recovery in the admiralty must be limited to one half the amount of the injury to the cargo. This determination, so far as I can ascertain, has

been acquiesced in, and appears to furnish the rule of the maritime law as now administered in the English admiralty. McLachlan, [Shipp.;] Williams & B. Adm. p. 76; Lown. Col. p. 5. The importance of agreement upon questions of this class between two nations, so closely connected in their commercial relations as England and America, would, of itself, go far to justify the adoption by American admiralty courts, in cases like the present, of the rule of the English admiralty. In accordance with these views, the decree will accordingly be that the libellants recover of the steamboat "Atlas" one-half of their loss by reason of the collision in the pleadings mentioned, and that it be referred to a commissioner to ascertain the amount.

[NOTE. This decree was affirmed by the circuit court in The Atlas, Case No. 634; but upon appeal to the supreme court the circuit court decree was reversed. See The Atlas, supra, and note; Phoenix Ins. Co. v. The Atlas, 93 U. S. 302.]