## Case No. 634.

### The ATLAS..

[10 Blatchf. 459.][1]

Circuit Court, E. D. New York. Feb. 25, 1873.[2]

COLLISION—BETWEEN STEAMERS —MUTUAL FAULT — APPORTIONMENT OF DAMAGES — LOOKOUT — COSTS.

1. A collision occurred between the steamboat A. and a boat in tow of the steam tug K., in the night, in the Kills. A libel was filed, in the district court, against the A. alone, to recover for the damages. That court held both vessels in fault, and awarded to the libelants, against the A., only one half of such damages. Both parties appealed. Held, that the decree was right.

[See note at end of case.]

2. The K. was held in fault for not porting, when meeting the A. nearly end on, and for starboarding, and crossing the course of the A., and for not slowing and stopping.

3. The A. was held in fault for not having a lookout, in view of her speed, such want of a lookout having contributed to the collision. It ought to be clear that the want of a lookout has wrought no mischief, before it can be excused.

[Cited in The Coe F. Young, 49 Fed. 168.]
[See note at end of case.]

4. The A. and the K. being both in fault, if both had been sued, each would have been held liable for one half of the damages; and the libelant cannot, by suing the A. alone, deprive the A. of any rights she has in that respect.

5. Both parties having appealed, no costs of appeal were allowed.

[On appeal from the district court of the United States for the eastern district of New York.]

[In admiralty. Libel in rem by the Phoenix

---

[1][Reported by Hon. Samuel Blatchford. District Judge, and here reprinted by permission.]
[2] [Affirming The Atlas, Case No. 633. Reversed by supreme court in Phoenix Ins. Co. v. The Atlas, 93 U. S. 302.]

Insurance Company, insurers of the cargo of the canal boat A. E. Hurd, against the steamboat Atlas, her engines, etc., the Camden & Amboy Railroad & Transportation Company, claimants.] This suit was brought in the district court, against the steamboat Atlas, to recover for the damages sustained by the loss of a boat in tow of the steam tug Kate, through a collision between such boat and the Atlas. That court held both the Kate and the Atlas to be in fault for the collision, [Case No. 633,] and awarded to the libelants, against the Atlas, one half of the damages reported. The claimants appealed from the decree, to this court, on the ground that the Atlas was not in fault, and the libelants appealed on the ground, that the Atlas was wholly in fault, and the Kate not at all in fault, and that, even if both vessels were in fault, the decree was wrong in not awarding to the libelants a decree against the Atlas for the whole damages reported. [Decree affirmed. An appeal was subsequently taken to the supreme court, where the decree was reversed. Phoenix Ins. Co. v. The Atlas, 93 U. S. 302. See note at end of case.]

Thomas E. Stillman and Charles Donohue, for libelants.

Charles F. Sanford, for claimants.

WOODRUFF, Circuit Judge. Without going into the detail of the evidence in this case, it must suffice to say, that the negligence and mismanagement of the persons navigating the tugboat Kate are fully established. On the testimony of the witnesses called from her by the libelants, that mismanagement was so gross as to admit of no excuse or palliation. Her own seamen, as well as the master of one of her tows, prove, that, putting out from New Brighton on Staten island, bound westwardly, up the Kills, she had crossed diagonally towards the New Jersey side, and had passed the middle of the Kills, and had taken her course westward, still slightly quartering on the New Jersey shore. The witnesses generally say she was two thirds over towards the New Jersey shore. Some make it from one half to two thirds over, and one of her hands says she was within 100 yards of the New Jersey shore, which was more than two thirds of the whole distance. She was proceeding up the Kills, when the steamboat Atlas came from the other direction. All of the witnesses agree, that the Atlas was running in, or very nearly in, the middle of the Kills. This, if true, shows, that there was an erroneous assumption in the opinion of the court below, namely, that the Atlas had the Kate and her tows on her starboard side. It proves the contrary. This is not all. Every witness from the Atlas testifies, positively, that they sighted the Kate and her tows, or so many of them as they saw, on their port or larboard side. They are not contradicted by other witnesses, nor by any facts or circumstances not in harmony with

their statement. I must regard that fact as proved beyond any doubt, and corroborated by the testimony from the Kate herself. It was, therefore, erroneous to say, that the rule of navigation placed upon the Atlas the burthen and duty of keeping out of the way of the Kate. But, if the Atlas had been within the operation of that rule, it would in no wise save the Kate from the imputation of gross fault and negligence; for, the same rule required her to keep her course, which she did not do nor attempt to do.

The Kills are narrow, not so narrow but that the vessels might pass each other, with great ease, in safety, but so narrow that vigilance and care were due from both vessels, and in the night season especially, and the pressure of the proper rules of navigation was more than usually stringent. In the course and direction of the two vessels, it is possible, that, if neither had done anything, they would have passed without colliding. Such is the opinion expressed by some of the witnesses; but, it is clear, I think, that their approach to each other was so nearly end on as to bring them under the rule which required each to pass to the right. In accordance with that rule, the Atlas ported, and signified her conformity to the rule, by one whistle. The Kate disobeyed the rule. She assumed to say, that she would go to the left, across the bows of the Atlas. She had no right to do this, upon any ground. The proof as to the depth of the water shows, that the suggestion that it would have been imprudent to draw a few feet nearer the New Jersey shore is a mere pretense; but, if not, then, surely, she had no right to assume, that, in the short interval following her two whistles, the Atlas, which was acting in obedience to what the Kate knew to be her duty, could herself go there in safety, and in season to avoid her. If, in the judgment of her master, it was not prudent to incline more to starboard, she should not have gone the other way, but should instantly have slowed, and, by signals indicating inability to conform to the rule, notified the Atlas of that judgment, thus leaving the Atlas the benefit of her own porting, and enabling her to pass, as, according to the evidence, she would, to the southward of her. If the Atlas had then failed, the Kate would, at least, have been free of the charge of thwarting her endeavor by her active misconduct. But, her blowing of two whistles was a double assurance to the Atlas, first, that the Kate was about to cross to the southward, and, also, that, in the judgment of the navigator of the Kate, it was proper for the Atlas to arrest her swing to starboard and go to port. Instantly putting her wheel to starboard, the Atlas rang to slow, stop and back, and it was done, but too late to avoid the collision.

It is said, that the Kate, on her starboard wheel, had swung but little to the southward, across the bows of the Atlas. It was to be expected, that her witnesses, in view of the

manifest fault in that maneuvre, and in the endeavor which, in obvious concert with the libelants, they make, to exonerate the tug, would be tempted to make this representation. The proof in relation to their lights, greatly preponderating against them, further tends to impair confidence in their testimony; and, in any view, it is clear, that their movement to the south—to their left—whether greater or less, and their wholly unwarranted arresting the southerly movement of the Atlas, were the fatal and inevitable causes of the collision. On the other hand, the instant the two whistles were blown by the tug, the Atlas did all that it was possible to do to avoid the consequence of the mismanagement of the latter, namely, stopped and backed, and, by starboarding, made the best effort to turn, (under some headway,) to pass by the stern of the tug, then on her swing to the southward.

The case is, therefore, this: The vessels were approaching nearly end on, the tug already on the port bow of the Atlas. Every rule of navigation required them to pass to the right of each other—port to port—and their position and courses were such, that, even without change by either, they would have passed clear. If the tug could not have inclined further to her right, she could, at least, have refrained from a movement in direct defeat of the intention of the Atlas to conform to the rule and pass to the southward. Instead of doing either, and without stopping, or even slowing, she turns across the course of the Atlas, to the left, and, by her signal, apprises the Atlas she was doing so, thus arresting and thwarting the proper movement of the Atlas, and placing herself and her tow in the way of the latter. To the tug there was no proper confusion of signals. She herself needlessly created it, by her two whistles, and yet did not even slow. The Atlas gave the proper signal and made the proper change, and, on the instant the two whistles, improperly blown by the tug, apprised her of the faulty movement of the latter, she stopped and reversed, and did all that was possible to avoid collision. Had the tug ported, or, even, had she done nothing, the Atlas was passing to the right of her, and would have passed with entire safety to both. In this state of the case, the collision was clearly and chiefly owing to the mismanagement and fault of the tug.

If it were material, I should say, that the large preponderance of the evidence is, that the tug had not, at the time, proper lights. The proofs greatly impair confidence in the witnesses whose testimony tends to the contrary; and the uniform testimony of the other witnesses is, that no lights on the Kate were visible, save, perhaps, one very low, either near her deck—possibly there—or, possibly, at the rear end of her hawser, on the staff of one of her tows. But, however great this fault, and though clearly subjecting her to liability, if the want of sufficiently early sight-

ing of the vessels by either had been the cause of the collision, the observations already made show, that it was not caused so much by the want of her lights, as by her mismanagement, when each vessel had seen the other in full time for doing whatever it was proper each should do. Whether the Atlas would have seen her sooner if her lights were up and burning, or not, the proof is conclusive, that the lights of the Atlas were burning and bright; and the tug cannot claim, at all, that she had not the fullest opportunity and time for what she ought to have done. She can allege no hurry or unexpected approach of the Atlas, excusing the want of deliberation or judgment, or justifying her faulty mismanagement.

But, on the other hand, it was held, in the district court, that the Atlas, also, was in fault, and that such fault on her part contributed to the collision. That she was in fault cannot be denied. Indeed, the counsel for the claimants hardly insists that she was acting in compliance with the statute requiring a lookout. Act April 29, 1864, art. 20; 13 Stat. 61. She is not chargeable on the ground that her conduct after the tug was seen was not, in all respects, judicious and proper, and such as would have avoided a collision, if the tug had not improperly done what she did; but, on the ground that she ought not to have come down through the Kills, in the night, at the speed with which she was moving, without a lookout at the bow, vigilant in the performance of his duty. There is no evidence that her speed was-itself an unusual or improper speed for such a night, where vessels without any light could be seen at a very considerable distance. Indeed, the evidence does not show what her speed was at the time. It is only claimed to be presumptively fixed by a computation based on the time when she left New Brunswick, and the distance she had run at the time of the collision. The proof also establishes, fully, that her own proper lights were set and were burning and bright.

She was, nevertheless, navigating the Kills without a proper lookout, in violation of the rules of navigation; and thereupon, the question arises—did her fault in that respect contribute to the collision? Upon that question there is room for doubt and difference of opinion. The claimants, with great plausibility, insist, and, I think, the testimony shows, that her officers did see the tug in season to do what it was the duty of the Atlas to do in order to avoid her, and in season to do what would have avoided the tug if the latter had conformed to the rules of navigation, by porting her helm, or, even, if she had done nothing. The claimants further insist, that the Atlas did, in fact, what she ought to, and would, have done, had she seen the tug at a greater distance, and however far off; that there was no danger of collision when the Atlas ported as the law required, and none, in fact, until the last moment, when the tug

starboarded and threw herself in the way; that there was abundance of room to pass; that, had the Atlas seen the tug at a distance of a mile or more, she would have approached, and might properly approach, as she did, near the middle of the Kills, and, when drawing near, would have ported, to pass to the right, as the rule required; that this is just what she did do; that she would have signaled her intention to pass to the right, by one whistle; that this, also, she did; that, in either case, she would have passed in safety by, had not the tug violated every rule governing her situation, and thrown herself in the way; that, at the very instant the intention of the tug to do this was signaled, the Atlas slowed, stopped and reversed, and made every possible effort to avert the consequences of the other's fault; that she could not have known that intention any earlier; that not one of the movements of the Atlas would have been earlier, nor ought it to have been earlier, or different, if she had had the tug under observation for a mile or more; and that the measures to avert the consequences of the fault of the tug could not have been taken before that fault occurred.

There is much force in the argument of the counsel for the claimants on this point. The liability of the Atlas to contribute is not to be tested by the inquiry, whether she ought to have had a lookout, as an abstract question. Her want of a lookout is not to operate to release the tug from the consequences of her own fault. Such want of a lookout must be found to have contributed to the collision, or the fact is not material between these parties. Suppose, then, the Atlas had had a lookout, in the vigilant discharge of his duty, who had seen and reported the tug at a distance of a mile or more, and yet the Atlas had done just what she did do, and at the very time when, in fact, she did it, could it be said, upon the evidence, that she was in any fault? This question is, at least, a doubtful one. See The Pennsylvania, [Cases Nos. 10,-947 and 10,950.] If she did what it was right to do, and this was done when and as it ought to be done, and her seeing the tug sooner would have only made it more certain, that, acting wisely and skilfully, she would do just what in fact she did, then, in truth, it would be difficult to say that her want of a lookout contributed at all to the collision.

But, this view of the responsibility of the Atlas proceeds upon somewhat dangerous ground. She was in fault. Although her speed, in itself, was not improper, moving at her ordinary and proper speed, in the night, without a lookout, was improper. Such a lookout might, certainly, have discovered the tug earlier, and would have a better opportunity to discover what she was and which way she was going. The evidence is, that, even without lights, a vessel could be seen, that night, at a much greater distance than the tug was seen. When, in fact the pilot saw and reported the tug to the captain, they

were in doubt what the object in view was and what was its course. They did not see her at all until very near. Had a lookout been in the performance of his duty, their information would have been earlier and, presumptively, more full. The act of congress requiring a lookout assumes this, as the general rule. There would have been more time for observation and for deliberation, and I think that early measures by porting would have been taken, which would have tended to avoid the collision. This might even have prevented the faulty attempt of the tug to pass to the southward of the Atlas. The rule is a very important one, and it should be clear that its nonobservance wrought no mischief, before it should be excused. It is difficult to avoid the conclusion, also, that such early sighting of the tug would have subjected the Atlas to the rule requiring her to slow, until it became clear that she could pass safely by. Early precaution is the most useful, and, it is safe to say, that, in such a channel, it was peculiarly important, that, by a vigilant lookout, the Atlas should be apprised, at the earliest moment, when this precaution was called for.

Upon the question raised by the appeal of the libelants, I am disposed to concur with the district court, and upon the grounds assigned in the opinion there delivered. 4 Ben. 27, [The Atlas, Case No. 633.] It is an interesting and important question. I add to what was said in that opinion: The Kate and the Atlas, upon perfectly well settled principles, were, for the reasons above given, bound to contribute to the loss. Had the libelants, instead of joining hands with the Kate, to visit the consequences upon the Atlas alone, brought both into court, to be dealt with upon those settled principles, each must pay one half of the damages to which the libelants were entitled, (unless, possibly, in cases supposable, both of the offending vessels were injured in such unequal degree that an equal apportionment of the loss would give rise to a different equity.) The libelants came into this court with full knowledge of the rules governing courts of admiralty in cases of contributing fault. Those rules gave the Atlas rights of which the libelants could not deprive her, by electing to proceed against her alone. Even if it be conceded that the libelants, if contribution by the Kate could not be enforced, might then have recourse to the Atlas therefor—which concession is said to be called for by the decree made in the case of The Washington and The Gregory, 9 Wall. [76 U. S.] 513, where the point does not appear to have been made, and where all that can fairly be said of the decision is, that the court thought no wrong was done to the libelant by the decree—if, I say, such concession be made, it is still true, that the libelants, by proceeding in this court, eminently a court of equity, could not deprive the Atlas of the protection which results from such a provisional decree; and it is just and equitable that they be held to an election to take the contribution to which, with all the parties concerned before the court, the Atlas would have been subjected. Upon the distinct authorities cited, and the reasons, also, given by the district judge, and, also, because it is in accordance with what is equitable and just, the decree in this court must proceed in affirmance of the decree appealed from. and award to the libelants the one half of the damages reported. As both parties appealed, no costs of appeal should be allowed to either.

[NOTE. An appeal was taken to the supreme court, where the parties duly filed a stipulation agreeing that the collision occurred through the mutual fault of the two steamboats. thereby waiving all questions except the disputed right of libelants to recover for their full loss from the Atlas instead of the moiety decreed them by the circuit court. Mr. Justice Clifford, in delivering the opinion of the court, referred at length to the authorities supporting the principle that the damages should be apportioned where the fault is mutual, and remarked that two pertinent admissions were made in one of the cases, The Milan, Lush. 401, to wit: "(1) That the owner of the cargo, in such a controversy, could recover for his whole loss in an action at law; (2) that the owner of the cargo, in such a case, is to be considered as a perfectly innocent party." The learned justice further said that "nothing is more clear than the right of a plaintiff, having suffered such a loss, to sue, in a common-law action, all the wrongdoers, or any one of them, at his election; and it is equally clear that, if he did not contribute to the disaster, he is entitled to judgment in either case for the full amount of his loss * * * Goods shipped as cargo, and their owners, as in the case before the court, are innocent of all wrong. The owners of the cargo may sue the owners of one of the ships, or both, and they may sue at law or go into the admiralty, at their election, and, having proved their case, they are as much entitled to full compensation in the admiralty as they would have been if they had elected to pursue their common-law remedy, saved to them by the proviso contained in the ninth section of the judiciary act. 1 Stat. 77. Co-wrongdoers, not parties to the suit, cannot be decreed to pay any portion of the damage adjudged to the libelant. Nor is it a question in this case whether the party served may have process to compel the wrong-doers to appear and respond to the alleged wrongful act." The decree was reversed, and the cause remanded, with directions to reverse the decree of the district court, and enter a new decree in favor of the libelants for the entire damages as ascertained by the commissioner. The Atlas, 93 U. S. 302. See, also, The Juniata. Id. 340: The Virginia Ehrman, 97 U. S. 309; The City of Hartford, Id. 325: Leonard v. Whitwill. Case No. 8,261; The City of Paris, Id. 2,767; The Eleanora, Id. 4,335; The Charles Allen, 11 Fed. 319; The Golden Grove, 13 Fed. 699; The Wm. Murtagh, 17 Fed. 263; The Canima, Id. 272; The St. Lawrence, 19 Fed. 331; The Annie Williams, 20 Fed. 868; Gray v. Philadelphia & R. R. Co., 24 Fed. 169; The Troy, 28 Fed. 864; The Galileo, 29 Fed. 540.]