## Case No. 9,029.

### The MANITOBA.

[2 Flip. 241;[1] 11 Chi. Leg. News, 25; 3 Cin. Law Bul. 809.]

District Court, E. D. Michigan. Oct., 1878.[2]

COLLISION—DUE DILIGENCE—MEETING END ON—SPEED.

1. The collision act of 1864 [13 Stat. 58] provides that when steamers are meeting end on or nearly end on, they shall port—each one—and go to the right, but this applies to cases in which each steamer is, at night, in such position as to see both of the colored lights of the other. Where the red light is opposite the red light of the other it does not apply, and if the green light of one of the steamers is opposite the green light of the other, or if in any case each vessel

[1] [Reported by William Searcy Flippin, Esq., and here reprinted by permission.]

[2] [Affirmed by circuit court; case unreported. Decree of circuit court affirmed by supreme court in 122 U. S. 97, 7 Sup. Ct. 1158.]

shows to the other a single colored light directly ahead, or where both lights are anywhere but ahead, the rule does not apply.

[Cited in The M. M. Chase, Case No. 9,684; The New York, 53 Fed. 559; The Decatur H. Miller, 10 C. C. A. 284, 62 Fed. 95.]

2. There is no general obligation to slacken speed, although two steamers are found approaching each other in such a way as that it is necessary to change the helm in order to avoid a collision, yet such an obligation arises in case of continuous approach or when the approaching light is found to be closing in instead of opening out.

[Cited in The Jay Gould, 19 Fed. 769.]

3. If the question be whether there was promptness in giving and executing orders upon a steamer immediately before a collision, the fact that the master left the deck after the lights of the approaching vessel had been seen, and did not return until after a collision had become inevitable, may be looked to, as also the further fact that the engineer for two or three times left his post to observe the approaching lights. The court may properly consider such facts as indicating a want of due diligence.

The Comet was bound from Grand Island, Lake Superior, to Cleveland. Having rounded Whitefish Point at about 8 p. m. she saw the red light of the Manitoba when about one-fourth to one-half a point upon her port bow. The Comet immediately ported her wheel half a point and steadied. After running on a short time and finding that the Manitoba failed to open out, she ported again half a point, blew her whistle, which was not answered, and failing to shake off the Manitoba, which seemed to be swinging under her starboard wheel, the Comet again was put hard a-port, the Manitoba now shutting in her red and opening her green light. Then the engines of the Comet were stopped and reversed, but it was too late. She was struck on the port bow by the Manitoba and cut nearly in two, and sunk in less than two minutes. Eleven on board were lost. The Manitoba was charged with having brought about the result, because of starboarding her wheel instead of porting as she ought to have done, as the vessels meeting were end on, or nearly end on. The Manitoba claimed that, having passed St. Mary's canal, she made the bright light of the Comet when about half way between Round Island and Iroquois Point—that the Comet was coming on from the direction of Whitefish Point, and, if not heading on a course almost parallel opposite to that held by the Manitoba, was nearly doing so. The steamer, running at a moderate speed, was going about N. W. ½ N., and as the Comet was approaching she showed her bright and green light, which bore from one-half to three-fourths of a point upon the starboard bow of the Manitoba; that the latter vessel endeavored, if possible, to avoid collision and to that end starboarded half a point and steadied, but the propeller still came on, now exhibiting her green and white lights, and as though she would fairly pass to the starboard of the Manitoba. In fact she seemed to be off a little, but on a sudden she swung to starboard and across the bows of the Mani-

toba as though she were under a port wheel. The Manitoba at once was put hard a-starboard, the engines were stopped and reversed, but the propeller had approached so near that the collision was inevitable. The Comet, it was averred, had committed a fault in not starboarding instead of porting. The question raised and argued was: Whether these vessels on approaching each other had exhibited to each other a green or red light.

H. L. Tyrrell, for libellants.

W. A. Moore and F. H. Canfield, for claimants.

BROWN, District Judge. Before entering upon a discussion of the testimony, there is a legal proposition, to which the attention of the court was challenged at the outset of the argument, and which libellants claim is decisive of the case. Admitting the theory of the Manitoba to be true, that she made first the bright and then the green light of the Comet, three-quarters of a point on her starboard bow, it was insisted that the steamers were still meeting "nearly end on" within the 13th article, and that it was incumbent upon the Manitoba to port, instead of starboarding, as she did. The words "nearly end on" used in the 13th article, are susceptible of two entirely distinct interpretations. On behalf of the Comet, it is urged, that if vessels are approaching so nearly end on, that prudence will suggest a change of the helm to avoid a misapprehension or chance of collision, such change should always be made by porting, notwithstanding the approaching vessel may exhibit a green light upon the starboard bow. Under the other definition, if the two vessels are each exhibiting to the other lights of the same color, there is no risk of collision within the meaning of the article, and each vessel is bound to keep its own side and may pursue its course with unabated speed, or, as formulated in the lines of Mr. Gray: "Green to green or red to red, perfect safety, go ahead."

The earlier decisions, both English and American, no doubt go far to sustain the position of the libellants upon this point. The merchant shipping act, which in England preceded the present law, under which the vessels of all civilized nations are now navigated, provided that: "Whenever any ship, whether a steam or sailing ship, proceeding in one direction, meets any other ship, whether a steam or sailing ship, proceeding in another direction, so that if both ships were to continue their respective courses they would pass so near as to involve any risk of a collision, the helms of both ships shall be put to port, so as to pass on the port side of the other" (14 & 15 Vict. c. 79)—a rule substantially like the 13th article, except that it imposes upon the sailing vessel an obligation to port when meeting a steamer. In construing this rule in the case of The Mangerton, Swab. 120, a ship which was running free was held to be in fault, because seeing a steamer's green or starboard light three or four points

on her starboard bow, she held on her course, the master believing that, if the steamer did likewise, the vessel would have gone clear. He ought, it was said, to have expected that the steamer, on seeing his light, would have followed the rule and have ported; and should, therefore, have ported his own helm. See, also, The Admiral Boxer, Id. 193. In The Cleopatra, Id. 135, a steamer was condemned for having starboarded on making the bright and green lights of an approaching vessel three points on her starboard bow, distant about three miles. So, too, in the case of The Stork, Holt, Adm. Cas. 151, decided after the present law had taken effect, Dr. Lushington held, that in order to excuse the Stork from porting, "it must be quite clear there were three points difference and not less, for surely it would never do to contend, where they were so nearly meeting end on, that if the evidence should be it was one or two points only in the direction they were meeting, that that would be sufficient to dispense with the observance of this rule." On appeal to the privy council, the court refused to adopt the language of Dr. Lushington, but observed it was not necessary to lay down any rule if it were competent for them to do so. "It is sufficient to say, that, whether the vessels were in such a relative position as to involve the risk of a collision, must be always a question of fact to be determined upon the circumstances." The court, however, found that the vessels were in such a relative position that their course, if pursued, would have involved risk of a collision, and dismissed the appeal. In the case of The City of Paris, Id. 21, the question was put to the assessors: "When the steamer first saw the steam tug moving toward her, and two points on her starboard bow, taking into consideration these vessels being on opposite courses, was there danger of their meeting end on, or nearly end on, so as to involve a risk of collision?" and they answered, "that the vessels were coming nearly end on, and the duty of each was to have ported." In the case of The Fingal, Id. 160, the court considered that if vessels were within two points of meeting end on, they would fall within the latter part of the statement, "nearly end on." In the case of The Artemas, Id. 75, a difference of two points was held not to exempt the vessels from the regulation of the 11th article. See, also, The Mexican, Id. 130. A similar want of definiteness is apparent in the American authorities. See The Milwaukee [Case No. 9,626]; The Nichols, 7 Wall. [74 U. S.] 656.

These varying constructions of the act naturally led to a want of uniformity in the practice, ship masters as well as courts disagreeing among themselves as to how great a variance from dead ahead would still meet the requirements of nearly end on. There was a further difficulty involved in the fact that the exhibition of a green light or green and white lights directly ahead, or on the

starboard bow is consistent not only with vessels approaching upon a parallel course, but upon a course across that of the other vessel, in which case porting the helm would bring about the very disaster it was designed to avoid; in other words, the light may be dead ahead or nearly dead ahead, and yet the two ships may not be meeting end on. To justify porting under article 13, not only must the ship carrying the light be end on, but the two ships must be meeting each other in that position, and the exhibition of a single colored light directly ahead by no means justifies that inference.

To put an end to this uncertainty, and to define with the utmost practicable exactness the meaning of the words "nearly end on," on the 30th of July, 1868, an order in council was issued to the following effect: "The said two articles, numbered 11 and 13 respectively, only apply to cases where ships are meeting end on or nearly end on, in such a manner as to involve risk of collision. They consequently do not apply to two ships which must, if both keep on their respective courses, pass clear of each other. The only cases in which the said two articles apply are when each of the two ships is end on or nearly end on to the other; in other words, to cases in which, by day, each ship sees the mast of the other in a line or nearly in a line with her own, and, by night, to cases where each ship is in such a condition as to see both of the side lights of the other. The said two articles do not apply by day to cases in which the ship sees another ahead crossing her own course or, by night, to cases where the red light of one ship is opposed to the red light of the other, or where the green light of one ship is opposed to the green light of the other, or where a red light without a green light or a green light without a red light is seen ahead, or where both red and green lights are seen anywhere but ahead." While this order has never been formally accepted by the supreme court as the correct interpretation of the 13th article, it has received the sanction of the district courts for the Southern and Eastern districts of New York, and has not, so far as I can gather, been repudiated anywhere. It was adopted verbatim by Judge Blatchford in the case of The America [Case No. 281], and was approved by Judge Benedict in The Sylvester Hale [Id. 13,712]. By an imperial decree promulgated May 26, 1869, it was incorporated in the law of France (De Fresquet, Des Abordages, p. 107). It appears also to have been adopted by Hamburg, Russia and Sweden, in 1868. While in some cases, where a colored light is made very nearly dead ahead, it may lead vessels to approach each other in a dangerous proximity, it is quite evident that so long as each exhibits to the other a light of the same color, there can be no collision, and any liability to error or confusion can be obviated by porting from a red, or starboarding from a green light. As it is very desirable that the construction given to this law should be as uniform as the law itself is general, particularly upon waters where British and American vessels are constantly meeting each other, I deem it the safer and better plan to adopt the order in council as the law of this court, at least until overruled by a higher authority. I hold, therefore, that under her theory of the facts, the Manitoba was not in fault for starboarding as she did.

What the exact facts of the collision are it is certainly difficult to determine. Not only is the testimony upon either side in direct and irreconcilable conflict with that upon the other, but the witnesses upon one, if not upon both sides, swear to appearances utterly inconsistent with the movements of their own vessels as stated by them. The theory of the Comet that she made the red light of the Manitoba and kept it constantly on her port bow is not only sworn to directly by her master, her second mate, and her wheelsman, but it is claimed to be verified, and in fact demonstrated, by two subordinate circumstances, proved by uncontradicted testimony.

First. That the Comet, in rounding Whitefish Point, hugged as close to land as possible, expecting heavy seas, and, hence, when she straightened up on her course to Point Iroquois, she was further to the westward than the usual course of vessels intending to round that point would take them; while the Manitoba, intending to make Michipicoten, on the northeast shore, would naturally have been further to the eastward than the usual course of vessels rounding the point would take them.

The testimony of the Comet's crew does tend to show that she passed a little nearer to the point than usual, although there was a heavy wind from the southeast blowing on to the point, and it is a little difficult to see why she should wish to hug it so close; but in that regard, it appears to be contracted by that of the master and mate of the Havana, a steamer bound up, which passed the Comet a short distance below Whitefish Point and some seven or eight hundred feet upon her port side. These witnesses swear they passed Whitefish Point themselves at the usual distance of a mile or a mile and a quarter, indicating that the Comet was probably about a mile out from the Point when she passed it. In this connection, they also swear they saw the Manitoba's light astern and upon their port quarter. While it is true the Manitoba was intending to stop at Michipicoten, the direct course to which would lead her a considerable distance off Whitefish Point, yet as her crew unite in swearing that they were steering for the light upon the Point, keeping it a little off their port bow, and intending to pass it at the usual distance, I do not feel at liberty to say that they are not to be believed in this particular.

Second. Shortly after rounding Whitefish Point, the Comet made the lights of the barge Havana, a little to port, and to give her an

easy berth she ported half a point and ran from five to fifteen minutes under this port wheel, before resuming her southeast course down the lake. Whatever weight is given to this testimony is counterbalanced by the fact, that the general course of the Comet down to the lake was half a point further to the eastward than it would have been if she had been sailing in a course directly opposite to that of the Manitoba. The course of the Manitoba was northwest half north, while that of the Comet was directly southeast. The tendency of this divergence would be, assuming that the compasses of each were exactly alike, to display the green light of the Comet to the Manitoba. A change of half a point from a course parallel to that of the Manitoba, would, in a distance of six miles, carry the Comet about half a mile to the eastward of the Manitoba's course, assuming that the Manitoba was pursuing the usual course from Point Iroquois to Whitefish Point. While there is nothing showing that the Comet did deviate to that extent, it seems to me to offset any inference, which might be derived from the fact of the Comet porting to pass the Havana, that she was westward of the Manitoba's course.

Third. It is claimed to be a physical impossibility that these vessels should have collided as they did, from the positions in which the evidence of the Manitoba places them, at the time the Comet's wheel was put hard a-port, and the Manitoba's hard a-starboard. At the time the Comet put her wheel hard a-port, and exhibited her red light, the witnesses on board the Manitoba claim that she was from 350 to 400 feet ahead of her, and about the same distance to starboard. The speed of the Manitoba being considerably greater than that of the Comet, it would seem to follow that if the helm of the Manitoba had been put to starboard at the same time that that of the Comet was put to port, the Manitoba would have passed the point of intersection first; and hence, the inference is, that the relative positions were not as stated by the Manitoba, but that the Comet was to the port instead of to the starboard.

Assuming that the helms of both vessels were put hard over at the same moment, and adding to this the fact that the Manitoba was the faster vessel, it would necessarily follow that she would have passed the point of intersection first. But the theory of the Manitoba is not inconsistent with a sudden prior porting on the part of the Comet, and a failure on the part of the Manitoba to swing as rapidly to starboard as the Comet did to port. If the Comet ported her wheel before the Manitoba starboarded (and this is the Manitoba's theory) she would have the advantage of the Manitoba, and might pass the point of intersection first; it would naturally take some little time for the Manitoba to get her wheel hard over, and to deviate from her course. There is another inference, however, to be deduced from this theory of the Mani-

toba, to which allusion will be made hereafter.

The case made by the Comet is manifestly inconsistent with itself and untrue. If she made the Manitoba's red light on her port bow, and ported half a point and again another half point, and still she could not open out the approaching vessel, it shows conclusively they must have been approaching on converging lines, and the Manitoba must have displayed a green and not a red light. I am more inclined to think, however, that she made the red light of the Manitoba on her starboard bow; that her first porting brought her on a course exactly parallel to that of the Manitoba, and that her green light was displayed at a considerable greater distance than the Comet's testimony would seem to indicate, and that the collision was brought about by a persistent effort to apply the 13th rule, and to pass the Manitoba under a port helm. This is corroborated to a certain extent by the statement of Rafferty, the wheelsman, on cross-examination, that he judged the Manitoba was half a mile off when she showed her green light. I feel compelled to say, too, that considerable doubt is thrown upon the Comet's case by the testimony of Mr. Hathaway, the reporter of the Free Press, who swears that Captain Dugot told him that he had been on deck about half an hour, and leaving the boat in charge of the mate went below, but was not gone more than five minutes before returning. Hathaway being entirely disinterested, I am disposed to credit his testimony, notwithstanding Dugot's denial.

The case of the Manitoba is supported by the testimony of her master, mate, wheelsman, engineer and cabin boy, whose statements are also corroborated by those of four passengers. While in an ordinary collision case, the court will pay very little regard to a mere superiority in the number of the crew sworn, and will seek to determine the question of fault by the uncontradicted testimony, and by the probabilities of the case, I do not feel at liberty to treat so lightly the testimony of disinterested and intelligent passengers, provided they are so located as to be able to observe the bearing and color of approaching lights. The testimony of the Manitoba's passengers has aided me greatly in solving the difficult problem of the relative bearing of these vessels.

George Bisset, a merchant of Kinkarden, who was standing forward on the promenade deck, for twenty minutes before the collision, noticed the Manitoba steering between the white light of the Comet and the light upon Whitefish Point. Captain Symes came back and spoke to him; showed him the green light, and said: "We have to pass on the green side with our green side, and if a red light was shown we have to pass on the red side;" was then standing right at the center of the promenade deck; stood there until four or five minutes before the collision, then

going for a moment into the cabin to light
a cigar, returned to the deck and stood leaning against the railing on the starboard side,
about twenty feet from the stern. The Comet was still displaying a green light; looked
over his left shoulder to see her pass, and
not seeing her, looked ahead and saw her
cross the bows of the Manitoba. George W.
Barry, a druggist and insurance agent of
Lucknow, was standing on the bow of the
boat on the promenade deck, fifteen minutes
before the collision; saw the bright light of
the Comet on the starboard bow, and Whitefish light on the port bow, but did not notice
the colored light. Noticed Bisset and Captain Symes talking together; saw the sudden
sheer of the Comet across the bow. John S.
Tenant, a physician of Lucknow, was standing on the promenade deck, at the foot of the
ladder to the right of the pilot house; saw
the white and green lights of the Comet on
the starboard bow; the Manitoba seemed to
be steering between the Comet and Whitefish Point light; suddenly saw her sheer and
show a red light so near that he thought he
could throw a stone aboard of her. Angus
Bethune, paymaster on the railroad, from
Fort William to Red river, had been to Ottawa on government business, and was returning on the Manitoba. Was sitting at the
door of the engine room, taking a smoke; got
up and walked to the forward right hand
gangway of the steamer to look for Whitefish Point light; saw a steamer ahead; called the engineer and remained there, and soon
discovered the steamer was coming towards
us; said to him, there was a steamer coming,
and that she was on the wrong side. The engineer came up and said there was plenty of
room to pass on that side. Soon saw the
Comet down upon us, her broadside crossing
our bow. The engineer looked and ran back
to his engine. She would have passed on our
right hand side if she kept her course; seemed to be a couple of lengths or more off when
she changed her course.

Now conceding, what unfortunately is too
often true of sailors, that they place a higher
value on fidelity to their vessel than upon
fidelity to truth, and esteem their allegiance
more sacred than their oath, I cannot assume
that mere passengers are actuated by any
such motives. These four men have sworn
to a state of facts entirely inconsistent with
the theory of the Comet, and strongly corroborative of that of the Manitoba. They
were in a position to see, and they can hardly have been mistaken. They have sworn to
the truth, or they have been guilty of a perjury which has not even the excuse of self-
interest to palliate its heinousness.

I do not overlook in this connection the
statements said to have been made by the
master and engineer of the Manitoba after
the collision. They are sworn to by the master and second mate of the Comet, and denied by the parties who are said to have
made them. As the witnesses on both sides
are equally interested, and the words are
very likely to have been misunderstood, I
must hold that they are not proven.

Upon careful perusal of this testimony, I
am forced to the conclusion that these vessels were mutually displaying their green
lights, and that the collision was brought
about primarily by the unauthorized porting
of the Comet.

It only remains to consider whether the
Manitoba be not also in fault for not slackening speed. The testimony is uncontradicted
that the engineer did not receive the order to
stop and back until just as the vessels came
together. That there is no general obligation
to slacken speed, notwithstanding two steamers are approaching each other in such a manner that a change of helm is necessary to
avoid risk of collision, is undisputed. The
Earl of Elgin, L. R. 4 P. C. 8; The Free State,
91 U. S. 200.

It is equally clear that this obligation does
arise, whenever there is any uncertainty as
to the position or movements of the approaching vessel, or when she appears to be violating the rules of navigation. In the case of
The Earl of Elgin, an exception is made of
cases of a "continuous approach" by which
we are to understand, not merely where the
two colored lights continue to be visible, but
a single light appears to be closing in in such
a manner as to indicate that the courses
of the two vessels are converging. So in
the case of The Scotia, 14 Wall. [81 U. S.] 181,
the court remarked, "We have already said
that she was not bound to take any steps
to avoid a collision until danger of collision
should have been apprehended, and we think
there was no reason for apprehension until
the ship light was seen closing in upon her."
[Case No. 12,513.] See, also, The Mary Sanford [Id. 9,225].

In the case of Dyer v. National Steam Nav.
Co. [Case No. 4,224], the steamer was condemned for not slackening speed under similar circumstances. The court observed, "It
was the duty of the steamer, as soon as it
was noticed that she was not shaking off
the light by porting her helm, to have slackened her speed, and ascertained the direction in which the ship was sailing, and acted
accordingly; instead of which she kept up
her full speed until the collision was inevitable."

I see no reason to doubt that the Comet
continued to show her green light until within a short distance of the Manitoba. Her
course diverged a half point to the eastward of the Manitoba, consequently her first
porting brought her upon an exactly parallel
course, and as she was to the starboard of
the Manitoba she would continue to display
her green light, and as the Manitoba starboarded and opened out this light, she might
port another half point without shutting it
in or showing the red; but approaching the
Comet so nearly end on as she did, she was
bound to watch her lights with the utmost

vigilance, and to ease her engines the moment she perceived the Comet was failing in her duty. There could be no collision so long as the Comet continued to exhibit a green light, but there might be such an approach of this light as to show that the Comet had ported, a manoeuvre which, if persisted in, would inevitably throw her across the path of the Manitoba, and bring about a collision. That such continuous approach took place and was observed, is evident from the testimony of the master and mate. Captain Symes says that he made the green light three-fourths of a point on his starboard bow; that he remained on deck five or six minutes, and the green light then bore at least half a point on his starboard bow, showing, at least, that he was not opening it out. The mate, who remained in charge of the Manitoba up to the moment of the collision, says, that when they were one and a half or two miles apart, the green light bore three-fourths of a point on his starboard bow; that he then starboarded half a point, making the green light one and a fourth points off his starboard bow, but that when the Comet began to swing, the lights had closed in, so that it was not more than half a point or a point off. This shows that from the time the Manitoba starboarded, the Comet was steadily drawing in under a port wheel. If the two steamers were approaching upon an exactly parallel course, the light of the Comet would naturally open out, and the starboarding of the Manitoba would increase this tendency, so that if the Comet had kept her course, the angle of the green light with the course of the Manitoba would constantly approximate to a right angle. Instead of that, the light kept steadily closing in. There could be but one inference from this—the Comet had ported. This was manifest some time before she shut in her green light and displayed her red light, and the Manitoba should at least have eased her engines or blown a whistle, as required by the universal custom upon the lakes.

Nor am I satisfied that the order to stop and reverse was given as promptly as it should have been. According to the Manitoba's theory, the Comet was from 350 to 400 feet to the starboard, and about the same distance ahead of her before her change of light was observed. The entire testimony on the part of the Manitoba tends to show that the Comet would have passed from 300 to 400 feet from her if she had kept her course. Admitting that distances are deceptive, and that the Comet might have been much further ahead of the Manitoba than 400 feet, yet it seems to me, if the engines of the Manitoba had been promptly stopped and reversed, a collision might have been avoided. Obviously, this was the first and instant duty of the Manitoba, upon discovering the change of lights. A change of wheel was a matter of secondary consideration, but the obligation to stop and reverse was

imperative. In this respect the case is much like that of The Comet [Case No. 3,051], where the injured vessel in this case was libelled for sinking the steamer Silver Spray in Lake Huron. The observations of Judge Woodruff in that case are pertinent here. He condemned the Silver Spray, not only for starboarding, but for failure to slacken speed after the red light was disclosed upon her starboard bow. While I make no criticism upon the action of the Manitoba here in putting her helm hard a-starboard, although I think this was an error, I am of the opinion that she should have stopped and reversed. If she had ported or slowed and backed, and perhaps if she had done nothing, the collision would not have taken place. After a collision has become imminent, almost any error on the part of the steamer will be pardonable except that of not stopping and reversing; and for this error, which is rendered more probable by the fact that the engineer left his post and ran to the starboard gangway, after the Comet put her helm hard a-port, I think the Manitoba must be condemned. The Great Republic, 23 Wall. [90 U. S.] 20. I think, too, the conduct of the master in leaving the deck after the Comet's light had been visible for some time, and not returning till the collision had become inevitable, is open to criticism. Such changes in command are likely to lead to confusion, and are looked upon with great disfavor by the courts. Hazlett v. Conrad [Case No. 6,288].

A decree will be entered apportioning the damages and referring it to a commissioner to ascertain and compute the same.

[NOTE. On March 15. 1882, the commissioner's report as to the amount of damages was confirmed by the district court. The owners of the Manitoba then appealed to the circuit court from so much of the final decree of the district court as adjudged the Manitoba to be in fault. The circuit court heard the case on pleadings and proofs. and affirmed the decree of the court below (case unreported).

[The claimants of the Manitoba then took the case. on appeal. to the supreme court. Justice Blatchford delivered the opinion. affirming the decree of the circuit court. 122 U. S 97, 7 Sup. Ct. 1158.]