## THE NEW YORK.

### THE CONEMAUGH.

(District Court, E. D. Michigan. November 11, 1891.)

**1. COLLISION BETWEEN STEAMERS—MUTUAL FAULT—STEERING AND SAILING RULES.**

A tow descending the Detroit river, in making a landing, occupied all the channel, except a narrow passage on the Canadian shore. The steamer C., going downward, was approaching this passage, when she saw the lights of the steamer N. a mile below, ascending on the American side, also heading towards the passage. The C. gave the "passing signal," of two blasts, and repeated it twice on nearer approach, but received no answer. As she cleared the end of the tow, she suddenly lost the green light of the N., then a quarter of a mile away, whereupon she sounded an alarm of several short blasts, put her helm hard astarboard, and kept on at full speed, showing her starboard light to the N., which also kept on at full speed under a port helm, showing her port light. Just before the collision the wheel of the N. was starboarded, but too late to prevent her striking and sinking the C., with small damage to herself, near the eastern side of the channel. The N. did not hear the first or second signals, and did not see the C. until the alarm signal. The weather was favorable to sight and hearing, and the locality called for careful navigation. *Held*, that it was the duty of the N., on passing the tow, to resume her course upstream, and that the C. was therefore not bound to keep out of her way, by steering and sailing rule 19, (Rev. St. § 4233.)

**2. SAME—RULES 19 AND 21.**

The N. violated rule 19 by not holding her course, and rule 21 by not stopping or reversing, and therefore could not rely as a defense on the failure of the C. to obey those rules.

**3. SAME—NEGLECT TO ANSWER SIGNAL.**

It was the duty of the C., on losing the N.'s starboard lights, to stop and reverse, under rule 21, from which she was not excused by the fact that neglect in answering signals is common. She had no right to assume that her presence was known until her signals had been answered.

**4. SAME—FAULT IN EXTREMIS—PREVIOUS NOTICE OF PROBABLE DANGER.**

The C.'s failure to stop and reverse was not excusable as a fault in extremis, for she had notice of the danger before the N.'s sudden change of course.

In Admiralty. On libel and cross libel for collision.

Shaw & Wright and H. D. Goulder, for the Conemaugh.
Scuyler & Kremer and H. C. Wisner, for the New York.

SWAN, District Judge. The original libel in this cause was filed by the owner of the Conemaugh to recover damages for the sinking of that steamer by the propeller New York, October 21, 1891, in the Detroit river, a short distance below Sandwich, Ont. The New York also received injury, for which her owner filed a cross libel against the Conemaugh. The cases were heard as one. No proofs were offered on the part of the New York.

The circumstances attending the collision were as follows: The Conemaugh, a screw steamer of 1,609 tons burden, (registered,) and laden with 1,800 tons of flour and general merchandise, was on her way from Milwaukee to Erie, Pa. She had a full watch on deck, and her lights were properly placed and burning brightly. Between 7 and 8 o'clock P. M. of October 21, 1891, the night being clear and the weather fine, she had reached the vicinity of the Kasota piles,—the remains of a cofferdam used in raising the steamer Kasota, which had been there

sunk,—which were on the American side, near midchannel, and about three quarters of a mile above Smith's coal dock, hereinafter mentioned. At this point the Conemaugh received a signal of two blasts of the steam whistle of the steamer Burlington, which was bound down, having a tow of four vessels, and at that time was rounding to at Smith's coal dock, on the American side, for fuel, and exhibiting her masthead and green lights to the watch of the Conemaugh, who also saw the green light of the first vessel in tow as she followed the Burlington around, and cabin lights on other vessels of the tow. The Burlington and tow, in their evolution, formed a crescent whose westerly point was the coal dock, while its easterly end was further up the river and near the Canadian shore. The Conemaugh answered the Burlington's signal with two blasts. Her helm was put hard astarboard, her speed immediately checked, and she swung across the stream a short distance below the Kasota piles at an angle of about eight points from her former course. Finding that she was heading above the stern vessel of the tow, the Conemaugh's wheel was steadied and then ported to follow the tow, which in circling around occupied most of the navigable channel, leaving a passage on the Canadian or tow's port side. About simultaneously with the steadying of the Conemaugh, her master saw below the tow, and about a mile away, the white and red lights of an ascending steamer, which proved to be the New York, then somewhat on the American side of midchannel, and promptly gave her a passing signal, of two blasts of her whistle. To this no answer was made by the New York. When the two steamers were about three quarters of a mile apart the Conemaugh repeated her signal; the New York then showing her masthead and both colored lights. No reply was made by the New York to this second signal. The Conemaugh, still exhibiting only her masthead and green light, and heading about four points towards the Canadian shore from a direct course down the river, sounded a third signal of two blasts; the New York continuing to show all three of her lights, and being then apparently between and close on the port hand of the second and third barges of the tow. The last barge in tow was at this time a little forward of the starboard beam of the Conemaugh, about three lengths— say eight or nine hundred feet—below her, and the same distance from the Canadian shore. The New York made no answer to the Conemaugh's third signal, nor did she reduce her speed. About this time the Conemaugh, still running under check, steadied from the port helm, and almost simultaneously lost the green light of the New York, whereupon she sounded an alarm of several short blasts of her whistle, and put her wheel hard astarboard. The New York, running at full speed, was then about midway between the third and fourth barges of the tow, while the Conemaugh had just crossed the wake of the stern barge,—the Ferguson. The two steamers were then on converging courses about a quarter of a mile apart. The Conemaugh kept on at full speed with her wheel hard astarboard, showing the New York her masthead and starboard lights only, while the New York came up the river, still at full speed, under a port wheel, displaying her masthead and port lights to the Conemaugh. Just before the collision which naturally re-

sulted from these courses, the wheel of the New York was starboarded, but too late to avert the collision, and, stem on, she struck the Conemaugh on the starboard bow, sinking her within 10 minutes. The evidence concurs that the vessels came together on the extreme easterly side of the channel, scarcely a length from the place where the Conemaugh sank, and about 900 or 1,000 feet from, and a little on the port quarter of, the Ferguson,—the stern barge of the Burlington's tow. The amount claimed by the libel for the injuries to the Conemaugh, the expense of raising and repairing her, and the demurrage necessary for repairs, together with the damage done to her cargo, is $70,000. The cross libel alleges that the New York suffered damages to the amount of $3,000.

The answer of the New York admits that her watch heard neither the first nor second signals of the Conemaugh. It further states that "when the New York had arrived at a point abreast of the last barge in tow of the Burlington a signal of two whistles was heard; but being unable to see any vessel, and noticing only a white light close on the Canadian bank of the river, the signal of two blasts was not answered, as it seemed intended for some other vessel. * * *" It is also alleged that the speed of the New York in passing the tow was but four miles an hour, but the proofs establish that she maintained double that speed until the vessels came together. The faults of the New York are so many and flagrant that it may be doubted if judicial records afford a parallel to the negligence and recklessness of her navigation. The admitted facts, that her officers did not even hear the first two signals of the Conemaugh, and, though their attention was challenged to her by her third whistle, did not see her until the alarm whistles were sounded, when the vessels were scarcely a quarter of a mile apart, although the weather was favorable to sight and hearing and the conditions of the locality called for careful navigation, are conclusive that her master and lookout, if she had one, were either incompetent or grossly negligent of their duties. If her lookout saw and reported the lights of the Conemaugh, his exoneration makes the conduct of the master or other officer of the deck, in disregarding that warning, more reprehensible. The Conemaugh's whistle was loud and coarse, and her lights lawfully placed and burning. Nothing can palliate the negligence which failed to notice either. If the master were at his post, or giving attention to his duties, he should have heard or seen the descending steamer, despite the negligence or even the want of a lookout; for the lights were seen and the signals heard by the crews of the Burlington and her barges, and by persons at the coal dock, who were at a greater distance from the Conemaugh than the New York. Even after the Conemaugh was seen and heard, the action of the New York merits the severest condemnation. Invoking against the Conemaugh steering and sailing rules 19 and 21, the New York neither held her course as required by the first, but by porting thwarted the effort of her adversary to keep out of her way, nor slackened speed, stopped, or reversed, in compliance with rule 21, when the course, position, lights, and alarm whistles of the Conemaugh proclaimed the perilous proximity of the steamers, but kept her speed to

the very instant of collision. Under the circumstances, these offenses were scarcely less vicious than the criminal negligence which disregarded the lights and signals of the Conemaugh. The temporary departure of the New York from her general course up the river was necessitated by the position of the Burlington's tow. When she passed that, and saw the Conemaugh, it was her duty to starboard and resume her course as soon as possible, having regard to the exigencies of the situation. The John L. Hasbrouck, 93 U. S. 405–410. There was ample room for her to have obeyed this requirement, which would have taken her under the stern of the Conemaugh. The master of the Conemaugh had a right to expect that this plain duty would have been performed, for his vessel had then crossed the proper path of the New York. A fitter case for the exercise of the disciplinary power committed to the inspectors of steam vessels than that afforded by the navigation of the New York can scarcely be imagined. Revocation of the license of her master, or an extended period of suspension, would have a salutary effect in promoting the safety of life and property on the lakes. The case of the New York is without the shadow of a defense.

Was the Conemaugh guilty of fault contributing to the collision? The argument in her behalf—conceding that if the collision occurred in the proper course of the New York the Conemaugh must be held in fault, because, having the New York on her starboard side, she failed to keep out of her way—insists that, if she was a safe distance from the New York's lawful course when struck, then her measures to avoid the latter were timely and sufficient, and the New York should be held solely in fault for thwarting, by her unlawful change of course to starboard, the otherwise safe undertaking of the Conemaugh; that the presence of the tow, the distance between the vessels, and their positions and courses when the alarm whistles were sounded, justified the Conemaugh in starboarding to perform her statutory duty under rule 19; and, this granted, the place of the collision is conclusive of the sole liability of the New York. While rule 19 is absolute that the steamer having on her starboard hand another, whose course she is crossing, must keep out of the latter's way, it does not define the course to be pursued to effect that end. To diminish still further the risk of collision between steamers thus approaching, the supervising inspectors, under congressional authority, adopted rule 2 of the pilot rules for the lakes and seaboard, prescribing that such steamers "shall pass to the right of each other, as if meeting head and head, or nearly so, and the signals by whistle shall be given and answered promptly, as in that case specified." In the conditions to which it applies, this rule is to be read into rule 19 of the steering and sailing rules, (Rev. St. U. S. § 4233.) Yet, as declared by the inspectors themselves, it is not a rigid and invariable regulation, but is "to be complied with in all cases except when the steamers are navigating a crowded channel, or in the vicinity of wharves, * * *" and is, of course, also qualified by rule 24, (Rev. St. U. S. § 4233,) providing that, in construing and obeying the rules, "due regard must be had to all dangers of navigation, and to any special circumstances which may exist," etc. As it does not abso-

lutely impose on the steamer having another on her starboard hand the duty of porting under all circumstances, it is not inconsistent with the steering and sailing rules. The Atlas, 4 Ben. 27; The B. B. Saunders, 19 Fed. Rep. 121. These steamers were "navigating in a crowded channel," and that fact exempts the Conemaugh from the obligation to port, under pilot rule 2. The New York, in coming up, necessarily held her course close to the descending tow, passing within 50 or 100 feet from the fourth vessel, and only attained that distance by a sharp sheer to the starboard when abreast of the Amaranth, the third vessel in the tow. At that time the Conemaugh was under the stern of the Ferguson. She had crossed the New York's proper course, and the position of the latter in reference to the Burlington's tow left her no room to pass between the New York and the tow. There was, moreover, an unobstructed channel, six or seven hundred feet wide, on the starboard side of the New York. The Conemaugh also had a right to assume that the New York, on clearing the tow, would perform her duty, and resume her normal course. The Free State, 91 U. S. 204; The Scotia, 14 Wall. 170. Under these circumstances, the Conemaugh, with three fourths of the channel occupied by a tow, though crossing the course of the New York, was not under the rule of port helm, but might properly continue her course, provided there was time and room for that maneuver. If the case involved only the construction of rule 19, the proofs would be conclusive that the only breach of that rule was committed by the New York in failing to pursue her lawful way after passing the tow, but, instead thereof, swinging to starboard, and keeping on until she had overtaken the Conemaugh. Had the New York, after seeing the Conemaugh, even held the course on which she was passing the tow, collision would have been impossible, though she maintained her full speed. But, although the Conemaugh had crossed the lawful path of the New York, she had not cleared her actual course, which was indicated by the disappearance of the New York's green light between the Conemaugh's third signal and her alarm whistles. Up to the Conemaugh's second signal, her navigation had been cautious, and in exact conformity to the statutory and inspectors' rules. With a full watch, running under check, displaying proper lights, and sounding her whistle seasonably and repeatedly, she had exhausted every effort to herald her appearance, position, and purpose. Even to the giving of her third signal, the only criticism made of her conduct is based on inspectors' rule 3, that, though under check, she was not "slowed to a speed barely sufficient for steerage way," although the vessels had then approached within a half a mile of each other, and no understanding had been established with the ascending boat. This, however, though an infraction of that rule, had no relation to the collision; for the vessels were then so far apart, and on such courses, and held such relative positions to each other and the tow, that without risk of collision the Conemaugh would have safely crossed the bows of the New York, had the latter held her lawful way. But when the New York shut in her green light, its disappearance announced, and the alarm whistles of the Conemaugh acknowledged, risk of collision, which imposed on

each,. in their then dangerous. proximity, the duty of stopping and reversing. '.Both were knowingly, under the operation of rule 21, on courses involving risk of collision. The fact that the New York had not responded to either signal, but was drawing near .at full speed, with the eyes and ears of her watch closed to the presence and purpose of the Conemaugh, despite the warnings of her lights and signals, called for the extremest precautions on the part of the latter, and should in some measure have prepared her for the necessity of their instant adoption.

It is said that the silence of the New York was not conclusive evidence that she had not heard the signals of the Conemaugh; for, notwithstanding pilot rule 6 expressly requires that passing signals by whistle shall be given and answered "at all times when steamers are passing or meeting at a distance within half a mile of each other, and whether passing to starboard or port," the rule, it is matter of common knowledge, is often violated, despite the fact that failure to obey it has frequently been held the ground of condemnation of the offending vessel. The B. B. Saunders, 19 Fed. Rep. 118; The Garden City, Id. 533; The W. H. Beaman, 18 Fed. Rep. 334.

The presumption of law, however, is that the nonobservance of the rule by the New York was not willful. Moreover, under no circumstances should the prevalence of this illegal practice be received to excuse noncompliance with rules 21 and 24 of the steering and sailing rules. If it was prudent to check speed when approaching a tow moving in the same direction, the necessity of still greater care when she was about to meet and cross the course of a steamer rushing up the river at full speed, in evident ignorance of the presence of a descending vessel, was infinitely more obvious and urgent. Though not called upon to stop when no response was made to her passing signal, because she had the tow between herself and the New York, and there could be no collision while that was the case, yet, when the Conemaugh emerged from that shelter, she did so with knowledge, or at least reason to believe, that her presence was unknown to the New York, and that the safety of her advance was contingent on the latter's adherence to her course, which, though probable, was not assured, because the Conemaugh apparently was not a factor in her navigation. The Conemaugh, therefore, could not safely proceed in the expectation that the New York would obey rule 19, and hold her course, in the absence of knowledge on her part that there was a vessel in the vicinity to whom she owed that duty. The steering and sailing rules governing the course of vessels meeting in various situations contemplate that each knows the facts upon which it is called to act. If one alone has that knowledge, and perceives, or has reason to believe, that the other has not, she cannot justify proceeding on the course prescribed for the situation, and, in the event of a collision, ask the determination of the controversy by the rule of that course alone, regardless of the cognate rules of navigation. These rules are all qualified by rule 24, which enjoins due regard to the dangers of navigation, and special circumstances rendering departure from them neces-

sary to avoid immediate danger. There could scarcely be a greater "danger of navigation" than a large steamer approaching at full speed in the nighttime, in apparent ignorance of the presence of another. Each of such vessels is a menace to the safety of another, because their co-operation to a safe course is impossible. Under such circumstances, rules 21 and 24 are of paramount force. They condemn the effort of the Conemaugh to cross the bows of the New York without first obtaining recognition, and for failing to stop and reverse in so grave a peril as that produced by the New York's speed and change of course; and they and rule 19 condemn the New York for changing her course, and failing to stop and reverse when she saw the Conemaugh. In such a situation, failure to stop and reverse is an almost unpardonable sin against the maritime code. The Manitoba, 2 Flip. 241; Id., 122 U. S. 97, 7 Sup. Ct. Rep. 1158; The Stanmore, 10 Prob. Div. 135; The D. S. Gregory and The Washington, 2 Ben. 226, 236. It is strongly urged that this error has nothing to do with the disaster. That conclusion would require for its support clear proof, not merely that the violation of rule 21 did not probably, but could not have contributed to the collision. The Pennsylvania, 19 Wall. 125; The Fenham, L. R. 3 P. C. 212; Richelieu & O. Nav. Co. v. Boston Marine Ins. Co., 136 U. S. 408, 422, 10 Sup. Ct. Rep. 934. The proofs have not this force, but leave it at least doubtful whether the Conemaugh could have been stopped in time to avert the collision. The master, whose ingenuous and straightforward manner on the witness stand commends his testimony, frankly stated that he could not say whether or not that could have been done. The fact that the Conemaugh was struck abreast of the pilot house, about 30 feet abaft her stem, is persuasive at least that, had she stopped, she would have escaped the blow inflicted by the New York, though the New York might not have been so fortunate. The severe rule which makes the transgression of the statute prima facie a contributory cause is, however, not infrequently relaxed; and the most forcible consideration urged for the acquittal of the Conemaugh is founded on the indulgence of the courts to an error committed by a vessel which has been brought into immediate jeopardy by the fault of another. In such a case the injured party is not debarred from the recovery of damages if his vessel has done something wrong, and has not been maneuvered with perfect skill and presence of mind. Instances of application of this doctrine are: Steamship Co. v. Rumball, 21 How. 383; The Nichols, 7 Wall. 656–666; The Carroll, 8 Wall. 305; The Elizabeth Jones, 112 U. S. 526, 5 Sup. Ct. Rep. 468; The Maggie J. Smith, 123 U. S. 355, 8 Sup. Ct. Rep. 159; The Blue Jacket, 144 U. S. 371–391, 12 Sup. Ct. Rep. 711; The Bywell Castle, 4 Prob. Div. 219.

The argument is that the effort of the Conemaugh to keep out of the way by starboarding was justified by the circumstances which constitute the exception to pilot rule 2, namely, the obstruction created by the tow, and the danger of her attempting to pass between it and the New York, and, as the Conemaugh had met every requirement of prudence and the rules of navigation up to the instant of the New York's unlaw-

ful change of course, her failure to stop and reverse in the sudden emergency thereby produced should be held error in extremis. If the Conemaugh had come up in a position in which she was passing when the New York ported under assurances from the latter that the Conemaugh's presence was known, it might well be claimed that the circumstances disarmed the master of the latter of suspicion of danger, and entitled the Conemaugh's advance to the most lenient judgment. But such was not the case. The very vigilance of the Conemaugh as she neared the path of the New York recognized the danger of the situation before the New York ported, and her master frankly admits that after she ported he thought "there wasn't much chance to get away from her," when the Conemaugh starboarded hard just after sounding her alarm whistles. The apprehension that, if the New York should accept and act upon the passing signals by stopping and reversing, the Conemaugh would have been "in the road of the New York," cannot be admitted to justify the failure to take that precaution. There was nothing to suggest the probability of such action on the part of the New York, but on the contrary her actual course negatived the supposition. There could be but one result if both vessels persisted in going ahead. Every instant of advance made this more manifest. Stopping, if not an assurance of safety, was manifestly less dangerous than a race for the point of intersection, which at furthest was not more than 700 feet away. It is true that a master is entitled to have time to comprehend the exigencies of the situation before he can be held to have transgressed its law; or, to quote the language of the court in The Emmy Haase, 9 Prob. Div. 81, approved in Maclaren v. Campagnie Francaise, L. R. 9 App. Cas. 649, and The Beryl, 9 Prob. Div. 137, 138 "A man must have time to consider whether he should reverse or not. The court is not bound to hold that a man should exercise his judgment instantaneously. A short—but a very short—time must be allowed for that purpose." The time, however, must be measured, not by the watch, but by the circumstances. The conditions in this case, preceding the New York's change of course, were, as has been said, preparatory and cautionary. They so plainly forbade experiment that the duty of stopping and reversing needed no consideration. It seems to me it should have occurred to the officer on deck before his vessel had run a length. The equities of the case are so strongly in favor of the Conemaugh that the conclusion that she was also in fault has been reached with reluctance, and not without considerable doubt, in view of the extent to which adjudged cases of high authority have gone in referring collisions, in circumstances not unlike these, solely to the fault of the flagrant transgressor. The great disparity of fault has invited and received the consideration it merits. But the impossibility of enforcing the great commandment of the law of navigation which calls a halt when risk of collision is involved, compels me to adjudge both vessels at fault; and a decree will be entered to that effect, and the usual order of reference to a commissioner to ascertain and report damages. The costs will be equally divided.