## Case No. 4,100.

### The D. S. GREGORY and The GEORGE WASHINGTON.

[2 Ben. 226;[1] 1 Am. Law T. Rep. U. S. Cts. 95.]

District Court, S. D. New York. March, 1868.

COLLISION IN NEW YORK HARBOR — STEAM VESSELS CROSSING—SPEED—KEEPING COURSE—PASSENGER—SUNDAY LAW—DAMAGES.

1. A steam ferryboat, crossing the Hudson river, as she approached her slip on the New York side, saw a steamboat coming down the river about two hundred yards out from the piers, and blew one whistle as a signal and ported her wheel, and, as she saw that the other vessel did not change her course, blew another single whistle, and kept on with unslackened speed, till she was struck on the port side by the other steamboat.

2. The steamboat, coming down the river at the rate of twelve miles an hour, saw the ferryboat coming, and blew two whistles, and kept on with unabated speed and without any change of course, although she saw that the ferryboat paid no attention to her signal, until just before the collision, when her engine was stopped.

3. A passenger on the ferryboat, on her way to New York to attend divine service (the day being Sunday), was severely injured by the collision: Held, that both vessels were in fault.

[See note at end of case.]

4. When each vessel signaled, it was seen by her that there was "risk of collision," within the meaning of the 14th and 16th articles of the rules for avoiding collisions, contained in the act of April 29, 1864 (13 Stat. 60), and it was the duty of each of them to have then slowed and stopped.

[Cited in The City of New York, 15 Fed. 627; The Grand Republic, 16 Fed. 429; The New York, 53 Fed. 559.]

5. As the vessels were crossing, it was the duty of the steamboat, having the ferryboat on her starboard hand, to keep out of her way, according to the 14th article. Held, that it was the duty of the ferryboat, under the 14th and 18th articles, to have kept her course, and she was in fault in porting her helm.

6. The libellant could recover her damages against both vessels.

7. The libellant was not within the provisions of the Sunday law of the state of New York (1 Rev. St. pt. 1, c. 20, tit. 8, art. 8, § 70). If she had been, it would be no defence to her right of recovery.

8. On the evidence, the libellant was entitled to recover the expenses to which she had been put in consequence of the injury, including the value of some care and service which was gratuitously bestowed on her. Held, that she was also entitled to recover, for the injury, the damages consequent on her not being able to earn so much after it as before, and also compensation for the pain and mental distress

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission. 1 Am. Law T. Rep. U. S. Cts. 95, contains only a partial report.]

suffered by her, but nothing for exemplary or punitive damages.

[Cited in The Hope, 5 Fed. 825; Behrens v. The Furnessia, 35 Fed. 800; The Mineola, 44 Fed. 144.]

9. Decree for libellant for $10,000, one-half to be paid by each vessel.

[Cited in The Atlas, Case No. 633; The Helen R. Cooper, Id. 6,335.]

[See note at end of case.]

On the morning of Sunday, the 16th of September, 1866, the steam ferryboat D. S. Gregory, a vessel belonging to the New Jersey Railroad and Transportation Company, and plying regularly across the Hudson river, as a ferryboat, from a slip at the foot of Montgomery street, in Jersey City, in the state of New Jersey, to a slip at the foot of Desbrosses street, in the city of New York, left her slip on the New Jersey side, about twenty minutes past 10 o'clock a. m., with the libellant, Ann Cavan, on board, as a passenger, bound for her slip on the New York side. The libellant was on her way to New York to attend church. She took her seat on the right-hand side of the ladies' cabin, in the forward part of the same, toward the end nearest to New York, the ladies' cabin being on the port side of the boat, and the libellant's face being to the northward, and her right side to the eastward. Her back was thus toward the solid partition which separated the ladies' cabin from the portion of the boat occupied by wheeled vehicles. When the D. S. Gregory had reached a point within about two hundred yards of the entrance to her slip on the New York side, and was off pier 39, which forms the lower side of the slip, a collision occurred between her and the steamboat George Washington. The stem of the George Washington struck the port side of the D. S. Gregory about ten feet from what was then the easterly end of the ladies' cabin, and nearly opposite where the libellant sat, with such force as to go entirely through the width of the cabin, up to and through the partition before mentioned, and nearly up to the body of the vessel below, the cabin being built up upon the guard. The libellant was driven by the blow through the partition and thrown upon the deck, and buried under the wreck of crushed timbers and planks. She was very much bruised and cut, her right leg was broken in three several places, and her left leg was broken in one place. The libel alleged that the collision was caused by negligence and want of skill on the part of each vessel, and by their joint negligence and fault, and averred that each was in fault in not stopping and backing in season, after it became apparent that there was risk of collision from continuing on their respective courses, or in not keeping a good lookout, or other fault or mismanagement, and claimed damages from both vessels, or from either, to the amount of $10,000.

The answer of the D. S. Gregory was, in substance, that, after she left her slip at Jersey City, she proceeded in a northeasterly direction, on her accustomed route, toward her New York slip; that, while on her passage, her pilot discovered the George Washington approaching and coming down the river in a southerly course, the George Washington then being about six hundred yards off; that, when the D. S. Gregory was about five hundred yards off from the George Washington, and about the same distance from the New York slip, the pilot of the D. S. Gregory gave, as a signal, one short distinct blast of the steam whistle, indicating his intention to port his helm and pass to the right of the George Washington; that, at the same time he gave the signal, he ported his helm, with the expectation that the George Washington would port her helm and pass to the right of the D. S. Gregory, in accordance with the signal long established by the laws of navigation; that said signal was loud and distinct, sufficient to be heard on board of the George Washington, but the pilot of the George Washington entirely disregarded said signal, and continued his course in the same direction and at the same rate of speed, which was about twelve miles an hour; that thereafter, and when the George Washington had approached to within about three hundred yards of the D. S. Gregory, said signal of one short distinct blast of the steam whistle was again given, and again disregarded by the George Washington; that thereupon the D. S. Gregory stopped her engine, her speed being then about seven miles an hour; that the George Washington, in total disregard of the signals so given by the D. S. Gregory, continued her course without the slightest perceptible deviation, approaching the D. S. Gregory, the latter having, by means of porting her helm, changed her course more eastwardly; that the George Washington did not change her course at all, and did not stop her engine or moderate her speed until within fifteen or twenty yards of the D. S. Gregory, and then, with her speed but little, if any, diminished, ran violently into the D. S. Gregory, at right angles.

The George Washington was an excursion boat, and was, at the time of the collision, bound from the dock at the foot of Christopher street, New York, to the dock at the foot of Barclay street, New York, and thence on an excursion down the bay. The answer of the George Washington averred that she was going down in the usual track; that the D. S. Gregory would, in the usual course of things, have passed under her stern, but that, in consequence of the incompetence and want of skill of those on the D. S. Gregory, they approached the George Washington, and the latter blew two blasts, which indicated that she was going ahead of the D. S. Gregory; and that, finding that no attention was paid to such notice, and that the D. S. Gregory was attempting to pass ahead of the George Washington, the latter stopped and backed, but the collision could not be avoided.

[The answer of the Washington set up as a separate defense that the libellant could not recover because she was traveling on Sunday, in violation of the law of the state.] [2]

C. Van Santvoord and T. M. Adams, for libellant.

S. Webster and J. C. Jackson, for the D. S. Gregory.

Beebe, Dean & Donohue, for the George Washington.

BLATCHFORD, District Judge. This collision occurred in open day, and in clear weather, and when there was nothing to interfere with the power of vision or the capacity of manoeuvring on the part of either boat. The first fault was on the part of the George Washington. The testimony is, that, after she had left the dock at Christopher street, which was at pier 50, and was on her way down, at a speed of about twelve miles an hour, and at a distance out from the ends of the piers of about two hundred yards, and had reached a point about off the foot of Spring and Canal streets, between piers 42 and 43, she blew a signal of two blasts of her steam whistle. This signal was intended to indicate to some other and approaching vessel that the George Washington designed and intended to pass to her own left, and that such approaching vessel must pass to her own left. The approaching vessel was the D. S. Gregory. She was at no great distance. Her place of destination, the slip at the foot of Desbrosses street, between piers 39 and 40, was well known to the George Washington. The George Washington was above the entrance to such slip, and was on a course that would necessarily cross the course of the D. S. Gregory, and the D. S. Gregory was below the entrance to such slip, and was on a course that would necessarily cross the course of the George Washington, because the D. S. Gregory was proceeding from a starting point west of the course of the George Washington, to a point of destination east of such course. The signal by the George Washington was given because she saw that the courses of the two vessels were crossing, and because she saw there was risk of collision. She could have had no other object in giving the signal. The signal was made in view of the crossing course of the approaching ferryboat, and was intended for her, and was made in contemplation of risk of collision. It was an utterance by the George Washington as to the manoeuvre she intended to adopt in reference to the D. S. Gregory. This is shown by the answer of the George Washington. The answer avers, that the D. S. Gregory approached the George Washington, and that the latter blew two blasts (meaning one signal consisting of two blasts), which indicated that she was going ahead of the D. S. Gregory (that is, that she was going to her own

left and was going to leave the D. S. Gregory on the starboard side of the George Washington). It is quite certain, on the evidence, that this signal was given by the George Washington before any signal was given by the D. S. Gregory. To this signal by the George Washington there was no response by the D. S. Gregory. The answer of the George Washington avers, that the D. S. Gregory paid no attention to the signal; and such is the evidence. It does not seem to have been heard on board of the D. S. Gregory. If it was heard, it was not responded to by the D. S. Gregory, nor was any manoeuvre made by the D. S. Gregory, which indicated any assent by her that the George Washington should go ahead of her or to the left. Yet the George Washington kept on, with undiminished speed and without any divergence from her course, until she discovered that a collision must ensue, and then she stopped her engine, and reversed it. In this course of action, the George Washington violated the plain statutory rules of navigation. She had the D. S. Gregory on her own starboard side, and was, therefore, bound, by article 14 of the act of April 29, 1864 (13 Stat. 60), to keep out of her way, there being risk of collision from their crossing courses. The George Washington manifested her idea that there was risk of collision, by giving the signal she did. The D. S. Gregory was approaching on the starboard side of the George Washington. Under these circumstances, the George Washington had no right to keep on at such a rate of speed as twelve miles an hour toward the entrance to the slip of the ferryboat. It was her duty to keep out of the way of the ferryboat. Instead of that, she ran directly, with undiminished speed, into her way. She had no right to dictate, by signal, to the ferryboat, what course the ferryboat should pursue, much less had she a right, when she found that her signal was not responded to and not heeded, to persist in maintaining her course and her speed. When she gave her signal, indicating, in her judgment, risk of collision, she ought to have slackened her speed, or, if necessary, stopped her engine and reversed it. Article 16 of the act before mentioned is imperative, that every steam vessel, when approaching another vessel so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse. The expression, "risk of collision," as used in the 14th and 16th articles of the act, has a different meaning from the expression, "immediate danger," used in the 19th article. "Risk of collision" means chance, peril, hazard, or danger of collision merely, and not immediate danger. In view of the fact that the George Washington herself apprehended peril of collision, as manifested by her signal that she was going to adopt a certain course to avoid such peril, she cannot now be heard to say that there was not, at the time she gave the signal, any risk of collision. It was her duty

at that time to have slackened her speed, so as to have been controllable. If she had done so, she would have been able to fulfill her duty of keeping out of the way of the ferryboat. Her failure to do so makes her responsible for the collision

As to the D. S. Gregory, she knew that it was the duty of the George Washington to keep out of her way, and that it was her own corresponding duty to keep her own course, and thus permit the George Washington to keep out of her way. Instead of keeping her course, she changed it. Her answer sets forth fully the faults of her navigation, and they are fully proved. The courses of the two vessels were crossing, and the ferryboat had the George Washington on her own port side. It was, therefore, by articles 14 and 18 of the act, the duty of the ferryboat to keep her course, if there was risk of collision. That there was risk or peril of collision apprehended by the ferryboat is shown by the fact that, simultaneously with the change of course, she gave a signal to the George Washington consisting of one blast of her steam whistle. The answer of the ferryboat states, that this signal indicated her intention to port her helm and pass to the right of the George Washington, and that, at the same time she gave the signal, she ported her helm, with the expectation that the George Washington would port her helm and pass to the right of the ferryboat; that this signal was given when the George Washington was about five hundred yards distant; that the signal was unheeded by the George Washington, which continued her course in the same direction and at the same speed of twelve miles an hour; that, when the George Washington had approached to within about three hundred yards of the ferryboat, the latter gave another signal, consisting of one blast of her steam whistle; and that this second signal was also unheeded by the George Washington. These averments of the answer are sustained by the proof, and are sufficient, of themselves, to convict the ferryboat of faulty negligence. Her answer states, that the effect of porting her helm was to change her course more eastwardly. This was the fact. It brought her course more toward a right angle to the course on which the George Washington was running. This change of course by the ferryboat was a violation of her duty. It contributed to the collision, and makes her responsible for the collision. It was not a change of course caused by any danger of navigation, or by any other special circumstance, and it was not a manoeuvre caused by the pressure of immediate danger, so as to be within the exceptions contained in article 19 of the act. This change of course was persisted in by the ferryboat, notwithstanding she perceived that her new course was every instant involving greater peril of collision, and although the George Washington paid no heed to her signals, and

did not respond to them, but kept her course. And, even if it should be admitted, that the ferryboat adopted her new course at such a distance from the George Washington as to make it a course which she was entitled to keep, under article 18, as against the duty of the George Washington, under article 14, to keep out of her way as well after such change of course as before, still it was the duty of the ferryboat, under article 16, to have slackened her speed, and stopped her engine, and reversed it. She did not do so. She gave her signal, ported her helm, received no response to her signal, kept on at her speed, gave another signal, received no response to it, still kept on, and then rang the jingle bell to put on all the steam that could be got, which was done, and the crash came. Greater and more culpable recklessness in navigation cannot well be conceived. At the time she whistled, because there was risk of collision, it was her duty, because there was such risk, to have slowed, if not to have stopped her engine and reversed it. When she whistled a second time, if not before, it was her duty to have stopped her engine and reversed it. And she was conscious that this was her duty, for her answer avers, that, when she found that her second signal was disregarded by the George Washington, the engine of the ferryboat was stopped. This is utterly untrue. Not a single witness asserts it. On the contrary, the testimony is clear, that the speed of the ferryboat was not slackened. Her engineer says that the jingle bell to go ahead fast was rung and obeyed just after the first signal was given by the whistle of the ferryboat. Her full speed was kept up to the moment of collision. If she had slowed, as was her duty, when she first whistled, she would have been under control, and could have manoeuvred to avoid a collision, notwithstanding the course taken by the George Washington. And this is equally true in regard to the George Washington. If she had slowed, as was her duty, when she whistled, she would have been under control, and could have manoeuvred to avoid a collision, notwithstanding the change of course by the ferryboat, and notwithstanding the ferryboat's failure to diminish her speed.

It is very plain, on the evidence, that each boat was attempting to head off the other. Neither would give way to the other. Whether each failed to hear the signal or signals given by the other or not, each saw plainly what the other was attempting to do, and each blindly and recklessly rushed into the impending peril. Each violated two of the clearly prescribed rules of navigation in regard to steam vessels, and each must bear the consequences of its acts. These views would equally apply if either or each vessel were prosecuting the other for damages caused by the collision. As respects the libellant, the obligation of the ferryboat to her, growing out of the contract for carriage, to

be guilty of no negligence from which she could suffer, was more immediate than the obligation of the George Washington toward the libellant. But the facts of the case are such as to make both vessels responsible to the libellant for the damages she suffered by this collision, which was caused by the contributing, concurrent, and co-operating negligence of both. She has a right to join both of them in one suit in the admiralty, and have a decree therein against each or either, for her damages. The New Philadelphia, 1 Black [66 U. S.] 62, 76; Gordon v. The Mary J. Vaughan and The Telegraph [Case No. 5,617]; Colegrove v. New York & N. H. R. Co., 20 N. Y. 492.

The answer of the George Washington sets up, as a defence against the libellant's right to recover, that, at the time of the collision, she was traveling in this state on Sunday, in violation of a law of the state. The libel avers, that the libellant took passage on the ferryboat for the purpose of attending divine service at her usual place of worship in the city of New York. The testimony establishes this fact, and also that the place of worship was within twenty miles of her residence, from which she departed. The statute of New York which forbids traveling on Sunday (1 Rev. St. pt. 1, c. 20, tit. 8, art. 8, § 70), excepts the case of a person going to or returning from a church or place of worship within a distance of twenty miles. But, even if it were shown that the libellant was at the time violating the statute in question, that would be no objection to her right to recover in this suit. The state alone can take cognizance of her violation of the law, and punish her for it. This court cannot punish her by withholding from her her right to damages for this collision. Philadelphia, W. & B. R. Co., v. Philadelphia & H. de G. Steam Towboat Co., 23 How. [64 U. S.] 209. If such an objection could be set up in any case, it could scarcely be the policy of the law to permit it to be taken on behalf of a vessel which was at the time running as an excursion boat on Sunday, and assisting in the violation of the very statute invoked.

It only remains to fix the amount of damages which the libellant is entitled to recover. She was confined to her bed for nearly three months, and suffered very great pain during all that time. She is, and, on the evidence, always will be, unable to work for her support as she did before. One of her legs is shorter than the other, and the medical testimony is, that she will never entirely recover from the effects of the accident. It is shown that she herself paid out, for nursing and care of herself, the sum of $100. She was a domestic at service in a family as a nurse of children. The bill of the surgeon who attended her amounted to $613. His services were skillful, and are shown to have been worth fully that sum and more. Besides the nursing and care so paid for, she received much that was gratuitously bestowed, and was necessary to her comfort, and contributed greatly to ameliorate her condition. The value of this she is entitled to recover, as it was bestowed upon her because of her humble condition and her pecuniary need. I think an allowance for medical attendance and care and nursing, of $1,000 in all, is not an exaggerated amount. This sum represents actual outlay. Then, as to what she has lost by the accident. She was receiving, at the time, $12 a month and her board, as wages. She was a competent and faithful person, and capable of continuing to earn that amount. She can no longer earn it, and the evidence is satisfactory that, but for a charitable feeling on the part of kindly disposed friends, she could earn nothing steadily, regularly, and certainly. This, then, is a loss to her of $144 a year, and of her board, which it is reasonable to put at $6 a week, or $312 a year, making a total loss of $456 a year. The libellant was, at the time of the accident, about 40 years of age. The sum required, according to the Northampton tables, to produce, at that age, an annuity for life, of $456, is $4,881.48. This sum, added to the $1,000 before mentioned, makes $5,-881.48. Thus much the libellant is entitled to recover, as if she were a portion of the cargo of the ferryboat, which its owner is entitled to have restored, repaired, and replaced in the condition in which it was at the time of the collision. The aggregate sum named includes nothing for any attendance which it seems probable, from the evidence, she will require because of her disabled condition, and nothing for the physical pain and suffering which she has undergone, and which the medical testimony shows she must continue to suffer while she lives, and nothing for the distress of mind she has suffered, inseparable from the crushing of all hopes for the future in one dependent on the labor of her hands for her daily bread. Such physical pain and such mental distress are a legitimate ground for damages in a case of this kind, and are to be compensated by a pecuniary reward. Ransom v. New York & E. R. Co., 15 N. Y. 415; Curtis v. Rochester & S. R. Co., 18 N. Y. 534. I think an allowance, on this ground, sufficient to bring up the entire sum to the amount claimed in the libel, $10,000, is proper. The claim made by the libellant is a moderate one, and has been urged in no spirit of exaggeration. The injury to her was caused by the grossest negligence, particularly on the part of the ferryboat, because the slightest negligence on the part of the ferryboat was gross and culpable, in view of the obligation to the libellant as a passenger; and I am satisfied that a jury, if the pleadings were in a shape to admit of it, would award more than the sum of $10,000. I allow nothing for exemplary, punitive, or vindictive damages. The case is not one of malicious or wilful injury, although one of reckless negligence,

and is not a proper case for exemplary damages. Let a decree be entered against both vessels for $10,000, with costs.

NOTE. This decision was affirmed by the circuit court, on appeal, in October, 1868, with such modification as is shown by the following decree made in the cause by the circuit court: "This cause having been heard, on the pleadings and proofs, on the appeals of the New Jersey Railroad and Transportation Company, the claimants and owners of the steam ferryboat D. S. Gregory, and of William Meyers, Egbert Meyers, Jacob Meyers, and Michael Sherman, claimants and owners of the steamboat George Washington, from the decree of the district court of the United States for the southern district of New York, made on the 18th day of March, 1868, and having been argued by the advocates for the respective parties, and due deliberation having been had thereon; it is now ordered, adjudged, and decreed, that the said decree of the said district court be, and the same is hereby affirmed; and it is further ordered, adjudged, and decreed, that the libellant Ann Cavan recover from the steam ferryboat D. S. Gregory, her engines, tackle, &c., or her said claimants, and the steamboat George Washington, her engines, tackle, &c., or her said claimants, the sum of ten thousand dollars, the amount of the damages decreed to her by the decree of the said district court, together with three hundred and ninety-eight dollars and six cents, her costs, as taxed in said district court, in all amounting to the sum of ten thousand three hundred and ninety-eight dollars and six cents, adjudged to the said libellant by said decree of said district court: and it is further ordered, adjudged, and decreed, that the said libellant recover of said steam ferryboat D. S. Gregory, her engines, tackle, &c., or of her said claimants, and of the steamboat George Washington, her engines, tackle, &c., or her said claimants, interest on the amount of said damages and costs, so adjudged by said decree of said district court, from March 18th, 1868, the date of said decree in the said district court, to the date of the entry of this decree, amounting to the sum of three hundred and ninety-eight dollars and sixty cents, together with the costs on the appeal to this court, taxed at two hundred and forty-one dollars and thirty cents, for all of which said damages, costs and interest adjudged to said libellant, amounting, in the aggregate, to the sum of eleven thousand and thirty-seven dollars and ninety-six cents, it is hereby adjudged and decreed, that the respective claimants of each vessel shall be held and are responsible to said libellant; and it is further ordered, adjudged, and decreed, that, as between the claimants of the respective vessels, the said amount of damages, interest and costs, and accruing interest and charges, be equally apportioned and paid between and by the said steam ferryboat D. S. Gregory, her engines, tackle, &c., or her said claimants, and the said steamboat George Washington, or her said claimants; and it is further ordered, adjudged, and decreed, that, on the payment by the claimants of either vessel of one-half of the said amount of damages, costs and interest, with accruing interest and charges thereon, the proceedings of the libellant be stayed as to such vessel and her claimants, for the collection of the residue, until the return by the marshal of an execution unsatisfied against the claimants of the other vessel, for the other half part of said amount, or until it shall otherwise appear that the said libellant is unable to enforce or collect the other half part of said amount of damages, costs and interest, with accruing interest and charges, against the claimants of the other vessel, by process from this court; and any of the parties are to be at liberty to apply to this court, if occasion shall require, touching the enforcement of the decree."

On appeals taken by the claimants the decree of the circuit court was affirmed by the supreme court upon the same grounds, substantially, as those stated by Judge Blatchford in the foregoing opinion. See The Washington v. Cavan, 9 Wall. (76 U. S.) 513.]