## THE CITY OF NEW YORK.

*(District Court, S. D. New York.   March 5, 1883.)*

.1. COLLISION—RULES OF NAVIGATION—FAULT BY NON-OBSERVANCE. .

 The non-observance of the statutory rules of navigation is itself a fault which charges the vessel with damages, where it appears that but for this fault the collision would have been avoided.

2. STEAMER IN FOG—MODERATE SPEED—RULE 17.

 Where a steamer in a fog does not go at " moderate " speed nor " slacken," as soon as there is perceptible danger of collision, as required by rule 17, and a collision ensues, which would have been avoided had the rule been observed, *held,* that the steamer is chargeable with fault, and responsible, notwithstanding the fault of the other vessel, also without which the collision would not have happened.

3. SAME—CASE STATED..

 Where the steamer " C. of N. Y.," in a fog, kept on her usual speed of 10 knots, and heard the fog-horn from the bark H. about a point on her starboard bow, and starboarded her helm, without either moderating or slackening her speed until she saw the bark coming across her bows about an eighth of a mile distant, and a collision afterwards ensued by which the H. was sunk, *held,* that the steamer was in fault both in going at too great a rate of speed, and also in not slackening her speed when the fog-horn was heard; it appearing that if she had done either the collision would have been avoided.

4. CONTRIBUTORY CAUSE—MUTUAL FAULT—DAMAGES DIVIDED.

 The bark being, at the time of the collision, headed about E., four points to the eastward of N. E., the usual course of vessels under similar circumstances, and the witnesses from the steamer testifying that when first observed the bark was heading N. E., but changed her course across the steamer's bow, while the mate of the bark testified that the only change about the time of the collision was a slight luff a few moments preceding it, and alleged a prior change from the course of N. E. nearly three hours previous, and it appearing that the latter change alleged by the mate involved extreme improbabilities as to the previous navigation, and was not in harmony with other parts of his testimony as to the bearing of lights, *held,* that the mate's testimony as to this change should be rejected, and the change of four points held to have been made near the time of the collison, notwithstanding the usual rule giving superior credit to a vessel's own officers as to her navigation, and the difficulties of observation from the steamer in the fog; and as this change of course contributed to the collision, the bark was also in fault and the damages should be divided.

In Admiralty.

*Scudder & Carter,* for libelants.

*A. O. Salter* and *R. D. Benedict,* for claimants.

BROWN, J. The libel in this case was filed by the owners of the iron bark Helen, a British vessel of about 450 tons burden, bound from Havana to New York, against the steamer City of New York, bound from New York to Havana, to recover for the loss of the bark and her cargo, valued at $52,000, which were sunk by a collision with

the steamer at 10:50 P. M. on the night of June 28, 1879, off the Jersey coast.

The libelants contend that the wind was W. S. W.; that the bark, from 8:15 P. M. to a few minutes preceding the collision, had been heading E. by N. ½ N., and making three to three and a half knots per hour; that soon after 10 P. M. the weather became foggy, with periods of greater density, and shortly before the collision had become quite thick; that the steamer's fog-whistle was first heard nearly abeam some two or three minutes before the collision; that the steamer's mast-head light was shortly after seen in the same direction, and next the steamer's green light; that the order was then given to "luff a little," which was at once obeyed, but before the wheel could be got down, and when the bark had changed her course thereunder not more than one point, she was struck on the port side just forward of the mizzen rigging by the stem of the steamer; that the bark's fog-horn had been blown properly during the fog; and that her colored lights were properly set and burning.

The speed of the steamer was nearly checked at the time of the collision; but the blow was sufficient to cause the bark to sink, in about 10 fathoms of water, in a few minutes afterwards. Five of the bark's crew, including the master, were drowned; and five, including the mate, the wheelsman, and one lookout, were saved; the mate being in charge of the navigation at the time.

The respondents contend that the wind was about S.; that the course of the steamer was S. by W. ½ W., and her speed about 10 knots per hour; that the night was fair, with moonlight; that the fog came on between 10 and 11, and at the time of the collision was such that the vessel's sails could be seen about an eighth of a mile distant; that the faint sound of a horn from the bark was first heard about a point on the starboard bow; that the steamer's wheel was at once starboarded; that the bark's head-sails next became first visible about one point on the steamer's starboard bow, apparently coming in a direction about opposite the course of the steamer; that very soon thereafter the bark was seen changing her course to the eastward, and swinging around so as to open her masts and show her red light; that the steamer's wheel was thereupon immediately changed to port, and her engines stopped and backed; that at the time of the collision she headed S. S. W. ½ W., having gone about three quarters of a point to port, under her starboard wheel, and come back to starboard, under her port wheel, one and three-fourths

points; and that the bark, under her port wheel, had come around so as to be heading, at the time of the collision, about E. or E. by N.,—a change of course, as claimed by the respondents, of from four to six points.

The respondents contend that when the bark's horn was first heard she was heading about N. E. or N. E. by N.; that she would have been avoided by the steamer under her starboard wheel had the bark kept her course; and that the collision was caused solely by the latter's change of course.

The libelants deny that there was any such material change of course by the bark, or any other change than a slight luff, *in extremis*, a few moments only before the collision, and when it was unavoidable.

The City of New York is a steamer of 1,715 tons measurement and 242 feet long; her greatest speed under steam and sail, according to the testimony, is 13 to 14 knots. Up to the time when her engine was stopped, after sighting the red light of the bark, there had been no slackening of speed since she left New York; and from the evidence it is clear that she was running at the rate of a little over 10 knots. There was a strong head-wind, described by those on board as very nearly directly ahead; and the master of the Old Dominion, who was sailing in close company, says the wind was sufficient to retard his vessel a mile and a half per hour. The effect of the wind upon the City of New York must have been similar; and as she used no sails, it is clear that her rate of 10 knots prior to making the bark must have been very near her full speed against this strong head-wind.

There is no substantial dispute in regard to the density of the fog. An eighth of a mile, or a little more, may be taken as the distance at which a vessel's sails could be seen on that moonlight night. The bark's head-sails, it is claimed, were seen at somewhat more than that distance, though the hull could not then be seen.

If the course of the bark had been N. E. by N., as claimed by the respondents, and that course kept by her, and if she were then one point on the steamer's starboard bow, I think it is clear that the steamer, under her starboard wheel, would have cleared the bark, whether the steamer's speed were unchecked, or had been "slackened" and reduced to a "moderate" speed of from five to seven knots.

The respondents contend, therefore, that the bark was solely responsible for the collision, by reason of the change of course which

they claim to have shown on the part of the bark; and that the steamer cannot be held chargeable, notwithstanding the fact that she did not at first, on hearing the bark's horn, "slacken" her speed, because such slackening of speed was not necessary to avoid the collision had the bark kept her course. Rule 21, however, provides that "every steam-vessel, when approaching another vessel, so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse, and every steam-vessel shall, when in a fog, go at a moderate speed." This rule plainly imposes upon a steamer two duties: (1) To proceed in a fog at a *moderate* speed; (2) in approaching another vessel so as to involve danger of collision, to *slacken* her speed, and, if necessary, to stop and back. Whenever this rule becomes applicable, then the duties it imposes are absolute and imperative obligations. They are not dependent, in the slightest degree, on the conduct or fault of the other vessel. Negligence in observing these obligations is itself a fault; and, if accidents ensue, it is incumbent on the vessel neglecting these duties, if she would exonerate herself from liability, to show clearly that this neglect in no way contributed to the collision.

Rule 21, I cannot doubt, is designed not merely to secure safety in case the other vessel observes exactly the duties incumbent on her, but to make navigation less perilous at all events, whatever may be the fault of either vessel, and that the consequences of even faulty navigation may be less fatal to life and property.

In this case, rule 21 was, I think, plainly applicable to the situation from the time when the horn of the bark was heard upon the steamer's starboard bow. The fog was such that the vessels could not be seen much more than an eighth of a mile apart. When the bark's horn was first heard, only a point on the steamer's starboard bow, and the course of neither vessel was known to the other, it is plain that the steamer was "approaching a sailing vessel so as to involve the risk of collision," within the meaning of rule 21. *The D. S. Gregory,* 2 Ben. 226, 234. The place was one where numerous vessels are constantly going up and down the coast. The bark, for aught known to the steamer, might have been going either in the same direction with her, or opposite, or beating to windward on her starboard tack; and in the latter case the steamer's starboard helm would have increased the peril.

The steamer in this case was going substantially at full speed; she starboarded, not upon any present observation of facts in regard to the course of the bark, but merely on surmise as to the most probable mode of avoiding the collision. The object of the sailing rules is to

provide safer guides than surmises, however probable, and to impose definite obligations on each vessel. Rule 21 required, not only that the steamer should be going at moderate speed, but also that in view of the danger she should slacken her speed. She did neither till the bark came into view, close at hand, and was seen crossing the steamer's bow. The collision was then inevitable; and not until then did the steamer check her full speed of 10 knots. That she had not previously slackened her speed was in itself, as I have said, a fault in her navigation, because it was a disobedience of a statutory rule; and this fault plainly contributed to the collision, because, if she had slackened her speed as required when the horn was heard about a point off her starboard bow, the collision clearly would not have happened.

The fact, if such be the fact, that the collision would, nevertheless, not have happened but for the fault of the bark in changing her course across the steamer's bow, does not relieve the steamer, because she had no right to disregard the statutory obligation to slacken her speed. The only effect of the other's fault would be to charge the latter also. If slackening speed would have made no difference as to the collision or the results of it, then the rule could not be invoked against her, because immaterial. But the fact here is clearly to the contrary; and the steamer is, therefore, chargeable with contributory negligence because she did not slacken speed as required, when, if she had done so, the collision would have been avoided. The same remarks apply in regard to the second clause of rule 21, which required the steamer, in this fog, to go at moderate speed. The fog, though not very dense, was sufficient to prevent any observation of the lights, or of the course of vessels, more than about an eighth of a mile distant, and it therefore diminished greatly the ordinary means of avoiding danger. The authorities are quite uniform in requiring a diminution of speed under such circumstances. Whatever "moderate speed" may be, under given circumstances, having reference, as it doubtless does, to the steamer's ordinary speed and her ability to stop quickly, the density of the fog, and the means which vessels have of observing each other, so as to avoid danger, it is, at least, something materially less than that full speed which is customary and allowable when there are no obstructions in the way of safe navigation. To continue at full speed, therefore, as the steamer in this case substantially did, until the bark was in sight, was a clear violation of the statutory obligation to go at a moderate speed. And as she would have cleared the bark if her speed had been less, she is necessarily chargeable with contributory negligence. *The Louisiana,*

2 Ben. 373–376; *McCready* v. *Goldsmith*, 18 How. 90; *St. John* v. *Paine*, 10 How. 583; *The Eleanora*, 17 Blatchf. 88, 91, 101; *The Great Eastern*, 11 Law T. Rep. (N. S.) 5; *The D. S. Gregory*, 2 Ben. 168.

The question whether the bark was also in fault presents great embarrassments upon the testimony in this case. Her duty was to keep her course. The libelants strenuously contend that she did so, except a slight and immaterial luff of not over one point to the eastward, a few moments before the collision, and when the collision was seen to be inevitable. If this was the only change of course made, she cannot be charged with fault. *The Northern Indiana*, 3 Blatchf. 92, 101; *The Genessee Chief*, 12 How. 443, 461; *The Favorita*, 18 Wall. 598, 603; *The Farnley*, 1 Fed. Rep. 631, 637.

The usual and ordinary course for vessels coming up this part of the coast, with a fair wind, is N. E. or N. E. by N. The steamer, before the bark's horn was heard, was going S. by W. ½ W. At the time of the collision the bark, as all the witnesses agree, was heading about E. or E. by N., or about four points to the eastward of the usual course of vessels bound for New York. Three witnesses from the steamer testify that they saw the bark rounding to the eastward when nearly an eighth of a mile distant; so that while her head sails only were seen at first, her masts, by this change of course, opened into view.

The mate of the bark, on the other hand, testifies that the captain went below shortly after 8 o'clock and was not again on deck until the collision; that by the captain's orders, at 8:15 P. M., the bark was put upon a course of E. by N. ½ N., and so continued without change until the slight luff above spoken of, a few minutes before the collision. This statement is, to a certain extent, corroborated by the wheelsman, who, at 10 o'clock, relieved "Jacob" at the wheel, and, as he says, received from him the course of E. by N. ½ N., which, he testifies, was kept until a few moments before the collision. "Jacob" was drowned, and there was no further confirmation of this testimony.

The question on this branch of the case is, how did the bark come to be heading E., or E. by N., at the time of the collision? Was it through the two prior changes of course, as testified to by the mate, viz., one at 8:15 P. M. from N. E. to E. by N. ½ N., and then a slight luff of one point only, just previous to the collision; or was it by a single change only, *i. e.*, one luff of about four points from a N. E. course, made after the fog signals were heard, and when the bark

was seen on the steamer's starboard bow, as testified to by the wit-nesses from the latter?

After a good deal of consideration and re-examination of the testimony, I find myself unable to credit the statement of the mate as to the change and course of the bark at and after 8 :15 P. M.   From the projection of the masts of the Helen above water, the precise place of the collision is known.   A buoy was placed there, and the position subsequently determined by the light-house board, as follows:   .

"From Barnegat light-house, N. ⅛ E., (magnetic,) distant 12½ miles; Tucker's Beach light-house, W. S. W. ¾ W., (magnetic,) distant 9½ miles; being 6¼ miles from shore, in 10 fathoms at low water."

This determination fixes the place of collision about half a mile nearer the shore than appears in the diagram of Capt. Trask, based upon previous testimony.   Proceeding backwards from the place of collision, as thus ascertained, upon the course alleged by the mate, the bark at 8 :15 P. M., at the rate of four knots per hour, would be upon the beach near Tucker's light-house; at the rate of three and a half knots, she would be near the breakers, about one mile to the eastward of the light; at the rate of three knots, she would have been about two miles from the light, and about three-quarters of a mile from land, in four fathoms of water.   The speed of the bark during this time is stated by the mate and wheelsman at from three to four knots; but considering that the bark had come from Cape Henlopen, which she made "in the forenoon" of that day, a distance of about 62 knots, at an average speed of about four and a half knots; that the mate himself says the bark during the day was going only a little faster than in the evening; and the further fact that at 9 P. M. the wind was blowing at the signal station at Barnegat at the rate of 24 miles per hour, nearly a gale, and is described by the steamer's witnesses as well as by the captain of the Old Dominion as a "strong breeze" of six to eight knots,—I think that the speed of the bark cannot have been less than four knots per hour.

The mate further testifies that prior to the alleged change of course at 8 :15 P. M. the bark had been sailing N. E. during the day. Tracing still further backward the course of the vessel accordingly, the bark would have been ashore on the shoals above Absecom light, reckoning from her place at 8 :15 P. M. as found according to the mate's testimony, and a speed of three and a half knots prior to the collision; or she would have been aground off Atlantic City, reckoning backward from her place at 8 :15 P. M., resulting from a speed of only three knots prior to the collision.

But if the bark's course be traced back from the place of collision by the usual route,—say a N. E. course,—we should find the bark, at the rate of four knots, at 8:15 P. M. at a point four and three-fourth miles from shore, in nine fathoms of water, about five and one-half miles distant from Tucker's light-house, which would bear about N. N. W., while Barnegat would bear N. N. E. 20½ miles distant, and Absecom light would bear W. S. W. about nine and seven-eighths miles distant. At 8 P. M., when the mate came on deck and observed the lights, Absecom light would have been W. S. W. three-fourths W. nine miles distant; Tucker's light, five and three-fourths; and Barnegat, 21¼ miles distant. Absecom light would, therefore, be at that time two points on the bark's port quarter, and Tucker's light two points forward of her beam. These positions of the vessel and the bearings of lights derived from the ordinary course of vessels coming up the coast and passing through the place of this collision, not only agree with the British sailing directions for this region, of which it must be presumed the master had a copy and which he would naturally follow, but they also agree precisely with the position and bearing of the lights which the mate testifies to observing when he came up on deck at 8 P. M., viz., one (Absecom) aft and one (Tucker's Beach light) "a little forward of abeam," as he reported it; although it is conceded that he was wrong in naming the lights, and the direction, N. N. E., given by him cannot be correct. Tucker's Beach light, a small light visible at best but 12 miles, would naturally be only dimly descried five and three-fourth miles distant in the twilight, a half an hour after sunset; Absecom light, visible 19 miles, and then only nine miles distant, would be seen on the quarter; while Barnegat, visible only 19 miles at best, would, in this twilight and 21¼ miles distant, be invisible.

Upon the previous course given by the mate, on the other hand, whether the speed be taken at three knots or four, the bark at 8 o'clock must have been only a mile or two E. by N. from Little Egg harbor (Tucker's) light; and at that distance there could not possibly have been any of that difficulty in discovering it which it is obvious there was from the mate's testimony; while Barnegat, 16 to 17 miles distant, in the early evening twilight, could not possibly, I think, have been discerned; and, if it were seen, it would not be "a little forward of abeam," nor even N. N. E., but nearly N. E., or nearly directly ahead, as the bark was then steering; and no light at all could have existed "a little forward of abeam," as the mate testifies that he reported it. Nor, if the bark were headed E. by N. ½ N. at 8:15,

would Barnegat light, when it afterwards came into view in the mate's watch, have been seen "two points off the port bow," as Brown, then on the lookout, testifies; though Camellieri, the other lookout, says he saw none, (and there was no other than Barnegat light which could have been seen except astern;) while that light would have been seen in just that direction, viz., two points off the port bow, if the bark had reached the place of collision by a N. E. course.

The story of the mate as to the course of the bark previous to the collision must, for these various reasons, therefore, be rejected as wholly incredible in itself and irreconcilable with his testimony and that of others in regard to the lights. Rejecting the alleged change at 8:15 P. M., there is no other change from the previous north-easterly course which the evidence admits, except that made after the fog signals of the vessels were heard by each other; for not only does the mate say that there was no other change, but, as the captain was not on deck, it is not to be supposed that the mate would change the course without orders. Nor has the court any right, if it finds the mate's statement false as to the alleged change of course at 8:15, to substitute some other time between 8:15 and the collision when such a change might have been made, except the admitted change made shortly before the collision; and having no other testimony to go upon, it must assume that the previous N. E. course continued until this last change was made, especially as that course is the customary one, and is found to harmonize with all the other circumstances and probabilities of the case.

The usual north-easterly course to the point of collision harmonizes, as I have said, with the distance and bearing of the lights, with the sailing directions, and with the natural course of navigation after making Cape Henlopen. It accords, also, with the weight of testimony in regard to the wind. All the witnesses on the bark state that the wind was very nearly aft—about a point on the starboard quarter. The mate of the bark testifies that the wind was "W. S. W., or a little southerly." Evidence was taken from the signal stations from Sandy Hook to Cape May; but none of it makes the wind W. S. W. At Sandy Hook, and by one observer at Atlantic City, the wind is given as S. W.; while the light-house keeper at Atlantic City, and the evidence from Barnegat and from Cape May, make the wind S. The testimony of those on board the steamer, as well as that of the master of the Old Dominion, gives the wind as nearly directly ahead, or about S.; while the mate of the bark, in his deposition before the consul, was recorded as giving the wind

S. S. W. When examined on that point at the trial, he claimed to have subsequently corrected that statement before the consul. The respondent's copy of his deposition gives the wind S. S. W., while the libelant's copy in one place still gives the wind S. S. W.

On the whole, I am of the opinion that the weight of testimony shows that the wind was somewhere from S. W. to S. S. W., and this confirms the previous conclusion that the bark, up to the time of the collision, had been sailing on a N. E. course, since that would bring such a wind about a point on her starboard quarter, as all her witnesses testify. The fact that the bark's jibs were not set, and that other sails which could not draw with an aft wind were furled, confirms the testimony that she was sailing with the wind very near astern. It is not impossible that the course E. by N. $\frac{1}{2}$ N., testified to by the mate and wheelsman, may have been derived from that course adopted for a short time after making Cape Henlopen, in the forenoon, by the same watch; since that course might, for a short time, have been naturally followed if the captain found himself within a few miles of the cape.

The improbabilities or impossibilities involved in the mate's testimony cannot be accounted for upon any theory of the master's ignorance of his position; for it appears that Cape Henlopen had been made in the forenoon. Shortly after, the land above Cape May, which is visible some four miles at least, was seen. The day was clear. An azimuth had been taken, and shortly before 8 P. M. the lead had been thrown. These circumstances show that the master must have known his position perfectly. I cannot doubt, therefore, that he kept the ordinary and prescribed course, running from three to six miles from shore. There was no reason why he should deviate from it. This usual north-easterly course, continued above Absecom, would carry the bark somewhat further off shore and bring her to the place of collision. The mate's testimony as to the alleged change of course at 8 : 15 P. M. I must, therefore, reject, as I have said, because it involves the most violent improbabilities as to the previous navigation of the bark, and is wholly irreconcilable with other accredited facts. I have no right to substitute any later change in the place of the one testified to at 8 : 15, and hence I must hold that the former course of N. E. was continued up to the time of the collision; that there was but one change of course instead of two, which brought the bark to heading nearly E., and that this change was the luff which her witnesses admit, except that it was a luff of three to four points, instead of one, and

begun earlier than they admit, while off the steamer's starboard bow, and not *in extremis*, as they allege.

Little weight can be attached to the testimony of those in the bark that the steamer's whistle, when first heard, seemed about abeam. The reflections of the waves of sound amid banks of fog are such as to render the seeming direction of sounds in a fog wholly unreliable. The wheelsman of the bark testifies that the order to luff was given when the steamer's mast-head light was seen. There is no reason to suppose this was not seen as early as the vessel's sails were visible to the lookout on the steamer; and that was probably somewhat over one-eighth of a mile distant; and the light was probably visible earlier than that. The two vessels were approaching each other from that time at a combined average speed of not exceeding eight knots, considering the change of course and the steamer's diminishing speed. This would give from one to two minutes from the time the mast-head light was visible until the collision, which was sufficient time, I judge, for the bark, with a strong aft wind, and no jibs set, to have luffed from three to four points. From the testimony of those on board the steamer as to what was done after first seeing the bark's sails, it would seem that more than one minute must have elapsed from that time up to the collision. Several of her witnesses estimate the time at from three to four minutes; the mate of the bark estimated it at three; but mere estimates of time under such circumstances are unreliable; and I think from one to two minutes is probably nearer correct; but this was sufficient for the change of three to four points.

I have not been unmindful of the rule which gives the most credit to a vessel's own witnesses in regard to her own motions; nor of the fact that observations from the steamer as to the bark's course through the fog, were in this case necessarily attended with much greater uncertainties than observations made in clear weather; and if the mate had given an account of the bark's course, which was in the slightest degree credible and reconcilable with his other testimony and the other facts in the case, so as to furnish a probable and consistent story, it would have been adopted without hesitation, notwithstanding all the steamer's testimony concerning the bark's apparent changes; but as I feel obliged to discredit the mate's testimony as to one of the most important facts in the case, and to remark also his suspicious indefiniteness and asserted want of knowledge concerning other important facts in regard to the position of the

bark, which he knew shortly before giving his testimony, and which it is not probable he had forgotten, such as the result of the azimuth, which he himself computed, the distance of the bark from shore, the depth of water on sounding, the time of making Cape Henlopen, etc., there is no alternative but to follow the testimony from the steamer, since this is not only consistent with itself, with the several changes in her own course which were based upon the facts testified to by her witnesses, but is also consistent with the only probable course which could have brought the bark to the place of collision.

The testimony from the steamer shows that the apparent course of the bark to the north-east when first observed, a point upon the steamer's starboard bow, would have carried her clear if unchanged. As this change of three to four points was too great, and was commenced too early and too far off from the steamer, to be regarded as a change *in extremis*, and as this change of course evidently contributed to the collision, the bark must also be held chargeable with fault, and a decree should therefore be entered for the libelants for the recovery of one-half the excess of their damages over the damages sustained by the steamer, and a reference directed to ascertain the amount, with costs.